Filed June 28, 2022

On behalf of:
    Patent Owner Masimo Corporation
By:  Jarom D. Kesler (Reg. No. 57,046)
    Stephen W. Larson (Reg. No. 69,133)
    Stephen C. Jensen (Reg. No. 35,556)
    Joseph R. Re (Reg. No. 31,291)
    Jacob L. Peterson (Reg. No. 65,096)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, 14th Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Email:  AppleIPR2020-1716@knobbe.com

## UNITED STATES PATENT AND TRADEMARK OFFICE

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

### APPLE INC.

Petitioner,

v.

### MASIMO CORPORATION,

Patent Owner.

IPR2020-01716
U.S. Patent 10,702,194

## PATENT OWNER'S NOTICE OF APPEAL TO
## THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgment – Final Written Decision (Paper 35) entered on April 28, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered May 5, 2021 (Paper 7).  Masimo appeals the Patent Trial and Appeal Board's determination that claims 1-30 of U.S. Patent 10,702,194 are unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01716 involving Patent 10,702,194.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, to the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: June 28, 2022    /Jarom Kesler/
    Jarom D. Kesler (Reg. No. 57,046)

Attorney for Patent Owner
Masimo Corporation

# ATTACHMENT A

Trials@uspto.gov                                    Paper 35
571-272-7822                           Entered: April 28, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01716
Patent 10,702,194 B1

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

WIEKER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01716
Patent 10,702,194 B1

## I.  INTRODUCTION

### A.  Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1–30 ("challenged claims") of U.S. Patent No. 10,702,194 B1 (Ex. 1001, "the '194 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a preliminary response.  Paper 6 ("PO Waiver").  We instituted an *inter partes* review of all challenged claims 1–30 on all grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 7 ("Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 15, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 19, "Pet. Reply"), and Patent Owner filed a Corrected Sur-reply (Paper 28, "PO Sur-reply").  An oral hearing was held on February 9, 2022, and a transcript of the hearing is included in the record.  Paper 34 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  For the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that challenged claims 1–30 of the '194 patent are unpatentable.

### B.  Related Matters

The parties identify the following matters related to the '194 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01716
Patent 10,702,194 B1

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01526 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 6,771,994 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01713 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,624,564 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01714 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01715 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,631,765 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01722 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01723 (PTAB Oct. 2, 2020) (challenging claims of U.S. Patent No. 10,470,695 B2);

IPR2020-01716
Patent 10,702,194 B1

> *Apple Inc. v. Masimo Corporation*, IPR2020-01733 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,702,195 B1); and

> *Apple Inc. v. Masimo Corporation*, IPR2020-01737 (PTAB Sept. 30, 2020) (challenging claims of U.S. Patent No. 10,709,366 B1).

Pet. 91; Paper 3, 1–4.

Patent Owner further identifies the following pending patent applications, among other issued and abandoned applications, that claim priority to, or share a priority claim with, the '194 patent:

> U.S. Patent Application No. 16/834,538;

> U.S. Patent Application No. 16/449,143; and

> U.S. Patent Application No. 16/805,605.

Paper 3, 1–2.

### C.   The '194 Patent

The '194 patent is titled "Multi-Stream Data Collection System for Noninvasive Measurement of Blood Constituents," and issued on July 7, 2020, from U.S. Patent Application No. 16/829,536, filed March 25, 2020. Ex. 1001, codes (21), (22), (45), (54). The '194 patent claims priority through a series of continuation and continuation-in-part applications to Provisional Application Nos. 61/078,228 and 61/078,207, both filed July 3, 2008. *Id.* at codes (60), (63).

The '194 patent discloses a two-part data collection system including a noninvasive sensor that communicates with a patient monitor. *Id.* at 2:49–51. The sensor includes a sensor housing, an optical source, and several photodetectors, and is used to measure a blood constituent or analyte, e.g., oxygen or glucose. *Id.* at 2:40–46, 3:8–9. The patient monitor includes a

IPR2020-01716
Patent 10,702,194 B1

display and a network interface for communicating with a handheld
computing device. *Id.* at 2:56–59.

Figure 1 of the '194 patent is reproduced below.



**FIG. 1**

Figure 1 illustrates a block diagram of data collection system 100 including
sensor 101 and monitor 109. *Id.* at 11:56–67. Sensor 101 includes optical
emitter 104 and detectors 106. *Id.* at 12:1–5. Emitters 104 emit light that is
attenuated or reflected by the patient's tissue at measurement site 102. *Id.* at
14:11–16. Detectors 106 capture and measure the light attenuated or
reflected from the tissue. *Id.* In response to the measured light,
detectors 106 output detector signals 107 to monitor 109 through front-end
interface 108. *Id.* at 14:16–19, 36–42. Sensor 101 also may include tissue
shaper 105, which may be in the form of a convex surface that: (1) reduces
the thickness of the patient's measurement site; and (2) provides more
surface area from which light can be detected. *Id.* at 11:7–23.

Monitor 109 includes signal processor 110 and user interface 112. *Id.*
at 15:27–29. "[S]ignal processor 110 includes processing logic that
determines measurements for desired analytes . . . based on the signals
received from the detectors." *Id.* at 15:32–35. User interface 112 presents

IPR2020-01716
Patent 10,702,194 B1

the measurements to a user on a display, e.g., a touch-screen display. *Id.* at 15:57–67. The monitor may be connected to storage device 114 and network interface 116. *Id.* at 16:4–22.

The '194 patent describes various examples of sensor devices. Figures 14D and 14F, reproduced below, illustrate detector portions of sensor devices.



**FIG. 14D**

FIG. 14F

Figure 14D illustrates portions of a detector submount and Figure 14F illustrates portions of a detector shell. *Id.* at 6:54–57. As shown in Figure 14D, multiple detectors 1410c are located within housing 1430 and under transparent cover 1432, on which protrusion 605b (or partially cylindrical protrusion 605) is disposed. *Id.* at 35:51–54, 36:45–52. Figure 14F illustrates a detector shell 306f including detectors 1410c on substrate 1400c. *Id.* at 37:25–33. Substrate 1400c is enclosed by shielding enclosure 1490 and noise shield 1403, which include window 1492a and window 1492b, respectively, placed above detectors 1410c. *Id.* Alternatively, cylindrical housing 1430 may be disposed under noise shield 1403 and may enclose detectors 1410c. *Id.* at 37:63–65.

IPR2020-01716
Patent 10,702,194 B1

Figures 4A and 4B, reproduced below, illustrate an alternative example of a tissue contact area of a sensor device.



**FIG. 4A**                    **FIG. 4B**

Figures 4A and 4B illustrate arrangements of protrusion 405 including measurement contact area 470. *Id.* at 23:30–36. "[M]easurement site contact area 470 can include a surface that molds body tissue of a measurement site." *Id.* "For example, . . . measurement site contact area 470 can be generally curved and/or convex with respect to the measurement site." *Id.* at 23:53–55. The measurement site contact area may include windows 420–423 that "mimic or approximately mimic a configuration of, or even house, a plurality of detectors." *Id.* at 23:61–24:8.

### D. Illustrative Claim

Of the challenged claims, claims 1, 20, and 30 are independent. Claim 1 is illustrative and is reproduced below.

1. A physiological measurement system comprising:

[a] a physiological sensor device comprising:

[b] one or more emitters configured to emit light into tissue of a user;

[c] a first set of photodiodes, wherein:

[d] the first set of photodiodes comprises at least four photodiodes,

[e] the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream, and

[f] each of the photodiodes of the first set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

[g] a second set of photodiodes, wherein:

[h] the second set of photodiodes comprises at least four photodiodes,

[i] the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream, and

[j] each of the photodiodes of the second set of photodiodes has a corresponding window that allows light to pass through to the photodiode;

[k] a wall that surrounds at least the first and second sets of photodiodes; and

[l] a cover comprising a protruding convex surface, wherein the protruding convex surface is above all of the photodiodes of the first and second sets of photodiodes, wherein at least a portion of the protruding convex surface is rigid, and wherein the cover is above the wall; and

[m] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises:

[n] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user;

[o] a touch-screen display configured to provide a user interface, wherein:

IPR2020-01716
Patent 10,702,194 B1

> [p] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and

> [q] an orientation of the user interface is configurable responsive to a user input; and

> [r] a storage device configured to at least temporarily store at least the measurements of the physiological parameter.

Ex. 1001, 45:2–49 (bracketed identifiers [a]–[r] added). Independent claim 20 includes limitations substantially similar to limitations [a]–[j] and [l]–[m] of claim 1. *Id.* at 47:9–36. Independent claim 30 includes limitations similar to limitations [a]–[r] of claim 1, and also includes additional recitations. *Id.* at 48:38–50:21 (reciting also a "substrate" and certain "preprocessing electronics").

### E.  Applied References

Petitioner relies upon the following references:

Beyer, Jr., U.S. Patent No. 7,031,728 B2, filed Sept. 21, 2004, issued Apr. 18, 2006 (Ex. 1019, "Beyer");

Ohsaki et al., U.S. Patent Application Publication No. 2001/0056243 A1, filed May 11, 2001, published December 27, 2001 (Ex. 1014, "Ohsaki");

Aizawa, U.S. Patent Application Publication No. 2002/0188210 A1, filed May 23, 2002, published December 12, 2002 (Ex. 1006, "Aizawa");

Y. Mendelson, et al., "Measurement Site and Photodetector Size Considerations in Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter," Proceedings of the 25th IEEE EMBS Annual International Conference, 3016–3019 (2003) (Ex. 1024, "Mendelson-2003"); and

Y. Mendelson et al., "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," Proceedings of the 28th IEEE

IPR2020-01716
Patent 10,702,194 B1

EMBS Annual International Conference, 912–915 (2006) (Ex. 1010,
"Mendelson-2006").

Pet. 2. Petitioner also submits, *inter alia*, the Declaration of Thomas W.
Kenny, Ph.D. (Ex. 1003), and the Second Declaration of Thomas W. Kenny
(Ex. 1060). Patent Owner submits, inter alia, the Declaration of Vijay K.
Madisetti, Ph.D. (Ex. 2004). The parties also provide deposition testimony
from Dr. Kenny and Dr. Madisetti, including from this and other
proceedings. *See* Exs. 1053–1054, 1056, 2006–2009, 2020, 2026, 2027.

### F. Asserted Grounds

Petitioner asserts that claims 1–30 are unpatentable based upon the
following grounds (Pet. 1–2):

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1–18, 20, 22–30 | 103 | Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006 |
| 19, 21 | 103 | Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, Beyer |

## II. DISCUSSION

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b). 37 C.F.R.
§ 42.100(b) (2019). Petitioner submits that no claim term requires express
construction. Pet. 3. Patent Owner submits that claim terms should be given
their ordinary and customary meaning, consistent with the Specification. PO
Resp. 9–10.

We agree that no claim terms require express construction. *Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co. Ltd.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017).

## B. Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The

---

[1] Patent Owner does not present objective evidence of non-obviousness.

IPR2020-01716
Patent 10,702,194 B1

burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.  *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information." Pet. 3 (citing Ex. 1003 ¶¶ 20–21). "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "[f]or this proceeding, [Patent Owner] nonetheless applies Petitioner's asserted level of skill." PO Resp. 10 (citing Ex. 2004 ¶¶ 30–32).

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

## D.  *Obviousness over the Combined Teachings of*
## *Aizawa, Mendelson-2003, Ohsaki, and Mendelson-2006*

Petitioner contends that claims 1–18, 20, and 22–30 of the '194 patent would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, and Mendelson-2006.  Pet. 12–72.

12

IPR2020-01716
Patent 10,702,194 B1

### 1. Overview of Aizawa (Ex. 1006)

Aizawa is a U.S. patent application publication titled "Pulse Wave Sensor and Pulse Rate Detector," and discloses a pulse wave sensor that detects light output from a light emitting diode and reflected from a patient's artery. Ex. 1006, codes (54), (57).

Figure 1(a) of Aizawa is reproduced below.



Figure 1(a) is a plan view of a pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(a), pulse wave sensor 2 includes light emitting diode ("LED") 21, four photodetectors 22 symmetrically disposed around LED 21, and holder 23 for storing LED 21 and photodetectors 22. *Id.* Aizawa discloses that, "to further improve detection efficiency, . . . the number of the photodetectors 22 may be increased." *Id.* ¶ 32, Fig. 4(a). "The same effect can be obtained when the number of photodetectors 22 is 1 and a plurality of light emitting diodes 21 are disposed around the photodetector 22." *Id.* ¶ 33.

IPR2020-01716
Patent 10,702,194 B1

Figure 1(b) of Aizawa is reproduced below.



Figure 1(b) is a sectional view of the pulse wave sensor. *Id.* ¶ 23. As shown in Figure 1(b), pulse wave sensor 2 includes drive detection circuit 24 for detecting a pulse wave by amplifying the outputs of photodetectors 22. *Id.* ¶ 23. Arithmetic circuit 3 computes a pulse rate from the detected pulse wave and transmitter 4 transmits the pulse rate data to an "unshown display." *Id.* The pulse rate detector further includes outer casing 5 for storing pulse wave sensor 2, acrylic transparent plate 6 mounted to detection face 23a of holder 23, and attachment belt 7. *Id.* ¶ 23.

Aizawa discloses that LED 21 and photodetectors 22 "are stored in cavities 23b and 23c formed in the detection face 23a" of the pulse wave sensor. *Id.* ¶ 24. Detection face 23a "is a contact side between the holder 23 and a wrist 10, respectively, at positions where the light emitting face 21s of the light emitting diode 21 and the light receiving faces 22s of the photodetectors 22 are set back from the above detection face 23a." *Id.* ¶ 24. Aizawa discloses that "a subject carries the above pulse rate detector 1 on the inner side of his/her wrist 10 . . . in such a manner that the light emitting face 21s of the light emitting diode 21 faces down (on the wrist 10 side)." *Id.* ¶ 26. Furthermore, "the above belt 7 is fastened such that the acrylic

transparent plate 6 becomes close to the artery 11 of the wrist 10. Thereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶¶ 26, 34.

## 2. *Overview of Mendelson-2003 (Ex. 1024)*

Mendelson-2003 is a journal article titled "Measurement Site and Photodetector Size Considerations in Optimizing Power Consumption of a Wearable Reflectance Pulse Oximeter," which discusses a pulse oximeter sensor in which "battery longevity could be extended considerably by employing a wide annularly shaped photodetector ring configuration and performing SpO$_2$ measurements from the forehead region." Ex. 1024, 3016.[2]

Mendelson-2003 explains that pulse oximetry uses sensors to monitor oxygen saturation (SpO$_2$), where the sensor typically includes light emitting diodes (LED) and a silicon photodetector (PD). *Id.* According to Mendelson-2003, when designing a pulse oximeter, it is important to offer "low power management without compromising signal quality." *Id.* at 3017. "However, high brightness LEDs commonly used in pulse oximeters require[] relatively high current pulses, typically in the range between 100–200mA. Thus, minimizing the drive currents supplied to the LEDs would contribute considerably toward the overall power saving in the design of a more efficient pulse oximeter." To achieve this goal, Mendelson-2003 discusses previous studies in which

> the driving currents supplied to the LEDs . . . could be lowered
> significantly    without    compromising    the    quality    of    the

---

[2] Petitioner cites to the native page numbers appearing at the top of Exhibit 1024, rather than the added page numbering at the bottom of the pages. We follow Petitioner's numbering scheme.

IPR2020-01716
Patent 10,702,194 B1

> [photoplethysmographic signal] by increasing the overall size of
> the PD . . . . Hence, by maximizing the light collected by the
> sensor, a very low power-consuming sensor could be developed,
> thereby extending the overall battery life of a pulse oximeter
> intended for telemedicine applications.

*Id.*

Mendelson-2003 discloses the prototype of such a sensor in Figure 1,
which is reproduced below, and served as the basis for the studies evaluated
in Mendelson-2003.



Figure 1 of Mendelson-2003 depicts a sensor configuration showing the
relative positions of its PDs and LEDs. *Id.* As shown in Figure 1, "six PDs
were positioned in a close inner-ring configuration at a radial distance of
6.0mm from the LEDs. The second set of six PDs spaced equally along an
outer-ring, separated from the LEDs by a radius of 10.0mm." *Id.*
Mendelson-2003 also explains that "[e]ach cluster of six PDs were wired in
parallel and connected through a central hub to the common summing input
of a current-to-voltage converter." *Id.*

Mendelson-2003 reports the results of the studies as follows:

> Despite the noticeable differences between the PPG
> signals measured from the wrist and forehead, the data plotted in
> Fig. 3 also revealed that considerable stronger PPGs could be
> obtained by widening the active area of the PD which helps to
> collect a bigger proportion of backscattered light intensity. The
> additional increase, however, depends on the area and relative
> position of the PD with respect to the LEDs. For example,

IPR2020-01716
Patent 10,702,194 B1

utilizing the outer-ring configuration, the overall increase in the average amplitudes of the R and IR PPGs measured from the forehead region was 23% and 40%, respectively. Similarly, the same increase in PD area produced an increase in the PPG signals measured from the wrist, but with a proportional higher increase of 42% and 73%.

*Id.* at 3019.

### 3. Overview of Ohsaki (Ex. 1014)

Ohsaki is a U.S. patent application publication titled "Wristwatch-type Human Pulse Wave Sensor Attached on Back Side of User's Wrist," and discloses an optical sensor for detecting a pulse wave of a human body. Ex. 1014, code (54), ¶ 3. Figure 1 of Ohsaki is reproduced below.



Figure 1 illustrates a cross-sectional view of pulse wave sensor 1 attached on the back side of user's wrist 4. *Id.* ¶¶ 12, 16. Pulse wave sensor 1 includes detecting element 2 and sensor body 3. *Id.* ¶ 16.

IPR2020-01716
Patent 10,702,194 B1

Figure 2 of Ohsaki, reproduced below, illustrates further detail of detecting element 2.



Figure 2 illustrates a mechanism for detecting a pulse wave. *Id.* ¶ 13. Detecting element 2 includes package 5, light emitting element 6, light receiving element 7, and translucent board 8. *Id.* ¶ 17. Light emitting element 6 and light receiving element 7 are arranged on circuit board 9 inside package 5. *Id.* ¶¶ 17, 19.

"[T]ranslucent board 8 is a glass board which is transparent to light, and attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. "[T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin," preventing detecting element 2 from slipping off the detecting position of the user's wrist. *Id.* ¶ 25. By preventing the detecting element from moving, the convex surface suppresses "variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the

18

IPR2020-01716
Patent 10,702,194 B1

user's skin." *Id.* Additionally, the convex surface prevents penetration by "noise such as disturbance light from the outside." *Id.*

Sensor body 3 is connected to detecting element 2 by signal line 13. *Id.* ¶ 20. Signal line 13 connects detecting element 2 to drive circuit 11, microcomputer 12, and a monitor display (not shown). *Id.* Drive circuit 11 drives light emitting element 6 to emit light toward wrist 4. *Id.* Detecting element 2 receives reflected light which is used by microcomputer 12 to calculate pulse rate. *Id.* "The monitor display shows the calculated pulse rate." *Id.*

### 4. *Mendelson-2006 (Ex. 1016)*

Mendelson-2006 is a journal article titled "A Wearable Reflectance Pulse Oximeter for Remote Physiological Monitoring," and discloses a wireless wearable pulse oximeter connected to a personal digital assistant ("PDA"). Ex. 1016, 1.

Figure 1 of Mendelson-2006 is reproduced below.



IPR2020-01716
Patent 10,702,194 B1

Figure 1 illustrates a sensor module attached to the skin (top), and a photograph of a disassembled sensor module and receiver module (bottom). The sensor module includes an optical transducer, a stack of round printed circuit boards, and a coin cell battery. *Id.* at 2.

Figure 2 of Mendelson-2006 is reproduced below.



Figure 2 depicts a system block diagram of the wearable, wireless, pulse oximeter including the sensor module (top) and the receiver module (bottom). *Id.* The sensor module includes at least one light-emitting diode ("LED"), a photodetector, signal processing circuitry, an embedded microcontroller, and an RF transceiver. *Id.* at 1–2. Mendelson-2006 discloses that a concentric array of discrete photodetectors could be used to increase the amount of backscattered light detected by a reflectance type pulse oximeter sensor. *Id.* at 4. The receiver module includes an embedded microcontroller, an RF transceiver for communicating with the sensor module, and a wireless module for communicating with the PDA. *Id.* at 2.

IPR2020-01716
Patent 10,702,194 B1

As a PDA for use with the system, Mendelson-2006 discloses "the HP iPAQ h4150 PDA because it can support both 802.11b and Bluetooth™ wireless communication" and "has sufficient computational resources." *Id.* at 3. Mendelson-2006 further discloses that

> [t]he use of a PDA as a local terminal also provides a low-cost touch screen interface. The user-friendly touch screen of the PDA offers additional flexibility. It enables multiple controls to occupy the same physical space and the controls appear only when needed. Additionally, a touch screen reduces development cost and time, because no external hardware is required. . . . The PDA can also serve to temporarily store vital medical information received from the wearable unit.

*Id.*

The PDA is shown in Figure 3 of Mendelson-2006, reproduced below.



Figure 3 illustrates a sample PDA and its graphical user interface ("GUI"). *Id.* Mendelson-2006 explains that the GUI allows the user to interact with the wearable system. *Id.* "The GUI was configured to present the input and output information to the user and allows easy activation of various functions." *Id.* "The GUI also displays the subject's vital signs, activity

21

level, body orientation, and a scrollable PPG waveform that is transmitted by the wearable device." *Id.* For example, the GUI displays numerical oxygen saturation ("SpO$_2$") and heart rate ("HR") values. *Id.*

### 5. *Independent Claim 1*

Petitioner contends that claim 1 would have been obvious over the combined teachings of Aizawa, Inokawa, Ohsaki, and Mendelson-2006. Pet. 30–54. Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties. For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

### i. *"A physiological measurement system comprising"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses the subject matter of the preamble.[3] Pet. 30; *see, e.g.*, Ex. 1006 ¶ 2 (disclosing "a pulse wave sensor for detecting the pulse wave of a subject").

### ii. *"[a] a physiological sensor device comprising"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses a physiological sensor device including a pulse rate detector. Pet. 30–31; *see, e.g.*, Ex. 1006 ¶ 23 (pulse wave sensor 2), Figs. 1(a)–(b).

---

[3] Whether the preamble is limiting need not be resolved because Petitioner shows sufficiently that the preamble's subject matter is satisfied by the prior art.

IPR2020-01716
Patent 10,702,194 B1

> iii.    *"[b] one or more emitters configured to emit light
>         into tissue of a user"*

The cited evidence supports Petitioner's undisputed contention that

Aizawa discloses LED 21 that emits light into a user's tissue.  Pet. 31; *see,*

*e.g.*, Ex. 1006 ¶ 23 ("LED 21 . . . for emitting light having a wavelength of a

near infrared range"), 27 (explaining that light is emitted toward the wrist),

Fig. 1(b) (depicting emitter 21 facing user tissue 10).

> iv.    *"[c] a first set of photodiodes, wherein: [d] the first
>        set of photodiodes comprises at least four
>        photodiodes"*
>        *and*
>        *"[g] a second set of photodiodes, wherein: [h] the
>        second set of photodiodes comprises at least four
>        photodiodes"*

<u>Petitioner's Undisputed Contentions</u>

Petitioner contends that Aizawa discloses a first set of four

photodiodes that are circularly arranged around a central emitter.  Pet. 16

(citing, e.g., Ex. 1006 ¶ 23).  Petitioner also contends that, in one

embodiment, Aizawa discloses that eight or more detectors may be used to

improve detection efficiency, but does not expressly teach a "second set of

photodiodes," as claimed.  *Id.* at 17 (citing, e.g., Ex. 1006, Fig. 4(a)); *see*

*also* Ex. 1003 ¶¶ 66–67.

Patent Owner does not dispute these contentions, and we agree with

Petitioner.  Aizawa discloses a set of "four phototransistors 22" that are

disposed in a single ring around central emitter 21.  Ex. 1006 ¶ 23,

Figs. 1(a)–1(b).  Aizawa also discloses that "the number of the

photodetectors 22 may be increased" to further improve detection efficiency,

and depicts in Figure 4(a) an embodiment where eight photodetectors 22 are disposed in a single ring around central emitter 21. *Id.* ¶ 32.

Also, according to Petitioner, Mendelson-2003 teaches a sensor that uses two rings of photodiodes, which improve light collection efficiency, permit use of lower brightness LEDs, and reduce power consumption. Pet. 18–19; *see also* Ex. 1003 ¶¶ 69–70.

Patent Owner does not dispute these contentions regarding what Mendelson-2003 discloses, and we agree with Petitioner. Mendelson-2003 teaches an experimental sensor in which "six PDs [(photodetectors)] were positioned in a close inner-ring configuration . . . [and a] second set of six PDs [were] spaced equally along an outer-ring." Ex. 1024, 3017, Fig. 1 (depicting a prototype sensor with a near ring of photodetectors and a far ring of photodetectors). Based on experiments using the dual-ring sensor, as compared to sensors using only a near ring or only a far ring, Mendelson-2003 states that "considerabl[y] stronger PPGs [photoplethysmographic signals] could be obtained by widening the active area of the PD which helps to collect a bigger proportion of backscattered light intensity." *Id.* at 3019, Fig. 3. Mendelson-2003 also states that, "by combining both PD sets to simulate a single large PD area, it is possible to further reduce the driving currents of the LEDs without compromising the amplitude or quality of the detected PPGs." *Id.* at 3019, Fig. 4. Finally, Mendelson-2003 teaches that estimated battery life for the dual-ring sensor, as compared to sensors using only a near ring or only a far ring, "could be extended considerably." *Id.* at 3019, Table 1 (battery life of 52.5 days for the dual-ring sensor, compared to 45.8 and 20.3 days for the near ring or far ring sensors, respectively).

<u>Petitioner's Disputed Contentions</u>

In view of these teachings, Petitioner contends that a person of ordinary skill in the art would have found it obvious to modify Aizawa to include an additional ring of detectors, as taught by Mendelson-2003, (i.e., a "second set") to "advance[e] Aizawa's goal of improving detection efficiency through increased power savings." Pet. 17–18 (citing, e.g., Ex. 1003 ¶ 68), 32–33 (citing, e.g., Ex. 1003 ¶¶ 90–91), 41–42 (citing, e.g., Ex. 1003 ¶¶ 100–101). According to Petitioner, "by using Mendelson-2003's power-saving (and thus efficiency-enhancing) PD configuration, the power consumption of a wrist-based pulse sensing device as in Aizawa can be reduced through use of a less bright and, hence, lower power-consuming LED." *Id.* at 19–20 (citing, e.g., Ex. 1003 ¶ 71).

Petitioner provides "[a]n example implementation of adding an additional ring of detectors to Aizawa, as per Mendelson-2003," which is reproduced below.



Pet. 20 (citing, e.g., Ex. 1003 ¶ 72). Petitioner's modified and annotated figure depicts Aizawa's sensor with Aizawa's first set of photodiodes (depicted as connected by a green ring) and modified to include a second set of photodiodes as taught by Mendelson-2003 (depicted as connected by a red ring). Pet. 20–21, 33, 41. Petitioner contends this would have been the

IPR2020-01716
Patent 10,702,194 B1

use of a known solution to improve similar systems in the same way, which "would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor," especially where Aizawa itself discloses adding extra detectors to improve light collection efficiency. *Id.* at 21–22 (citing, e.g., Ex. 1003 ¶ 74).

<u>Patent Owner's Arguments</u>

Patent Owner's arguments address limitations [c]–[e] and [g]–[i] together. *See* PO Resp. 55–66. As such, Patent Owner's arguments, the parties' Reply and Sur-reply briefing, and our analyses, are presented below in connection with limitations [e] and [i]. *See infra* § II.D.5.v.

> v. *"[e] the photodiodes of the first set of photodiodes are connected to one another in parallel to provide a first signal stream"*
> *and*
> *"[i] the photodiodes of the second set of photodiodes are connected to one another in parallel to provide a second signal stream"*

<u>Petitioner's Undisputed Contentions</u>

Petitioner contends that a signal stream is sent from Aizawa's set of photodetectors 23 to drive detection circuit 24, which amplifies the outputs of the photodetectors. Pet. 16 (citing, e.g., Ex. 1006 ¶ 23; Ex. 1003 ¶ 66).

Patent Owner does not dispute this contention, and we agree with Petitioner. Aizawa discloses that "drive detection circuit 24 [is] for detecting a pulse wave by amplifying the outputs of the photodetectors 22." Ex. 1006 ¶ 23.

Petitioner additionally contends that Mendelson-2003 teaches that each set of photodiodes, i.e., its near ring and far ring, is wired in parallel,

26

IPR2020-01716
Patent 10,702,194 B1

thereby providing a distinct signal stream for each ring.  Pet. 18, 34–35 (citing, e.g., Ex. 1024, 3017).

Patent Owner does not dispute this contention regarding what Mendelson-2003 discloses, and we agree with Petitioner.  Mendelson-2003 teaches that "[e]ach cluster of six PDs were wired in parallel and connected through a central hub to the common summing input of a current-to-voltage converter."  Ex. 1024, 3017.

Petitioner's Disputed Contentions

In view of these teachings, Petitioner contends that a person of ordinary skill in the art "would have recognized and/or found it obvious that the first set of photodiodes [in the modified system of Aizawa and Mendelson-2003, *see supra* § II.D.5.iv] are connected to one another in parallel to provide a first signal stream in the manner claimed," and "the photodiodes in the second/outer ring (i.e., second set of photodiodes) . . . are connected to one another in parallel to provide a second signal stream," as taught by Mendelson-2003.  Pet. 33–34, 42 (citing, e.g., Ex. 1003 ¶¶ 92–97, 102), 21 (citing, e.g., Ex. 1003 ¶ 73).  Petitioner contends this "would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor."  *Id.* at 21–22 (citing, e.g., Ex. 1003 ¶ 74).

According to Petitioner, this arrangement would have provided known benefits.  Pet. 34–38.  For example, Petitioner contends that a person of ordinary skill in the art "would have known that connecting multiple photodiodes together in parallel allows the current generated by the multiple photodiodes in [each] set/ring to be added to one another, thereby resulting in a larger total current akin to what would be generated from a single, large

27

detector." *Id.* at 34. According to Petitioner, this was "a routine and conventional design choice." *Id.* at 35. Further, "monitoring each signal stream (from each ring of detectors) separately allows the system to determine when the sensor device is so severely located that its position should be adjusted," and can help detect motion artifacts. *Id.* at 35–36 (citing Ex. 1003 ¶ 95).

Petitioner also argues that a person of skill in the art would have known that "the photodiodes in the far ring (i.e., second set of photodiodes) would receive reflected light having a lower intensity than that received by the photodiodes in the near ring (i.e., first set of photodiodes) and would have been motivated and found it obvious to account for this discrepancy," e.g., by "keep[ing] each ring separately wired and connected to its own amplifier . . . to thereby keep the magnitude of the current signals provided by each ring approximately the same before being combined and transmitted to the arithmetic circuit 3." *Id.* at 36–38 (citing Ex. 1003 ¶¶ 96–97); *id.* at 42 (citing Ex. 1003 ¶ 102).

Patent Owner's Arguments

Patent Owner disputes Petitioner's contentions that it would have been obvious (1) to modify Aizawa to include a second set of at least four photodiodes, and (2) to wire the photodiodes of the first set in parallel to provide a first signal stream and to wire the photodiodes of the second set in parallel to provide a second signal stream. PO Resp. 55–66; PO Sur-reply 24–30.

First, Patent Owner argues this proposed modification changes Aizawa's principle of operation. Specifically, Patent Owner claims that "Aizawa's approach monitors different individual detector signals and

IPR2020-01716
Patent 10,702,194 B1

calculates pulse rate based on each individual photodetector signal" and, in contrast to the proposed modification, "does not measure aggregated signals from detectors connected in parallel." PO Resp. 57 (citing Ex. 1006 ¶¶ 7, 19, 23, 27–29, 32, 36; Ex. 2004 ¶ 102; Ex. 2026, 76:13–22, 79:22–80:3). According to Patent Owner, the proposed modification "eliminates Aizawa's core feature—the ability to monitor pulse using the output of each individual detector, which Aizawa indicates avoids displacement problems." *Id.* at 58–59 (citing, e.g., Ex. 2004 ¶¶ 104–105).

Second, Patent Owner argues this proposed modification would have resulted in increased power consumption. *Id.* at 59. According to Patent Owner, Mendelson-2003 states that its power savings is caused by "increasing the ***number of detectors*** and thus the detector area, not the two-ring structure." *Id.* at 59–60 (citing Ex. 1024, 2; Ex. 2004 ¶ 106). Moreover, Patent Owner argues that Aizawa already discloses a way to improve detection efficiency—by including eight detectors in a single ring. *Id.* at 60 (citing Ex. 1006 ¶ 32, Fig. 4A; Ex. 2004 ¶ 107). In light of this teaching, Patent Owner argues that adding a second ring is unfounded and unnecessary, especially where the second ring of detectors "would receive substantially lower light intensity requiring greater power consumption to utilize than additional detectors added to the 'inner' ring." *Id.* at 60–62 (citing, e.g., Ex. 2004 ¶¶ 108–109; Ex. 2026, 55:7–17, 56:6–16, 59:14–60:7, 100:6–101,6, 102:5–17, 112:3–16). "Petitioner never explains why, given these straightforward options to increase signal strength, a [person of ordinary skill in the art] would instead add an entire new circle of detectors farther from the emitter." *Id.* at 62.

IPR2020-01716
Patent 10,702,194 B1

Third, Patent Owner argues that Mendelson-2003 provides only an experimental detector configuration, which would fail to provide the alleged benefits. Specifically, Patent Owner argues that Mendelson-2003 "uses its particular configuration for specific experiments comparing light intensity and LED drive currents for detectors arranged different distances from central emitters," and "teaches no benefits for this arrangement in practice." *Id.* at 62–63 (citing Ex. 1024, 4; Ex. 2004 ¶¶ 111–112). To the contrary, Patent Owner alleges that Mendelson-2003 actually prefers a single detector ring that outputs a single signal stream: "Mendelson 2003 explains it 'combin[ed] both PD sets to simulate *a single* large PD area,' and notes 'battery longevity could be extended considerably by employing *a* wide annular PD,' which has a single signal stream—not two different signal streams from two different parallel-connected rings." *Id.* at 63 (citing, e.g., Ex. 2026. 87:8–88:1, 91:15–92:7).[4] Thus, according to Patent Owner, even if a skilled artisan would have added a second ring of detectors to Aizawa, they "would not have kept the first and second ring of detectors *separate* or separately amplified the aggregated signals"; instead, they would have

---

[4] Patent Owner also criticizes the Petition's discussion of Exhibit 1025, U.S. Patent No. 6,801,799 ("Mendelson '799"), which is not included in Petitioner's identification of the asserted ground of unpatentability. PO Resp. 63–65; PO Sur-reply 29–30. We discern no error in Petitioner's identification of Mendelson '799. The nature of Petitioner's reliance on Mendelson '799 in support of this ground is explained clearly in the Petition, even if Mendelson '799 is not listed as an additional reference in the identification of the ground. Thus, the Petition complies with 35 U.S.C. § 312(a)(3) (stating an IPR petition must "identif[y], in writing and with particularity . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge").

IPR2020-01716
Patent 10,702,194 B1

"combin[ed] both PD sets to simulate *a single* large PD area," where "battery longevity could be extended considerably by employing a wide annular PD." *Id.* at 66 (quoting Ex. 1024, 4; citing Ex. 2004 ¶ 116).

Finally, Patent Owner argues that the proposed combination "introduces signal processing problems requiring a *further* redesign for Aizawa's sensor" to include a second amplifier to account for signals of different strengths between the near and far rings. *Id.* at 65–66 (citing Ex. 2004 ¶ 115). Patent Owner alleges this demonstrates that a skilled artisan would not have added a second ring of detectors, as proposed, but instead would have increased the number of detectors in Aizawa's single ring. *Id.* at 66.

Petitioner's Reply

Petitioner replies that Patent Owner mischaracterizes Aizawa's principle of operation. Pet. Reply 32–34. Specifically, Petitioner contends that Aizawa's detector ring is connected in parallel, or at least that a person of ordinary skill in the art would have recognized that parallel connection would have been a known implementation detail, which allows a signal to be detected even if one of the multiple sensors is displaced on the user. *Id.* at 33 (citing Ex. 1003 ¶¶ 93–94; Ex. 1060 ¶ 62; Ex. 2026, 72:3–9). Moreover, Petitioner argues that Aizawa lacks any disclosure of individually monitoring signals from each photodetector. *Id.* at 34.

Petitioner reiterates its position that adding a second ring would collect a bigger portion of backscattered light, and would have motivated the proposed combination. *Id.* at 35 (citing, e.g., Ex. 1060 ¶¶ 65–66). Petitioner also disputes that such a modification would increase power, noting that it is the emitters, not the detectors, that consume most power in the system. *Id.*

IPR2020-01716
Patent 10,702,194 B1

at 36 (citing, e.g., Ex. 1060 ¶ 67). Moreover, Petitioner contends that by widening the detection area with a second ring, the system would capture additional light which would allow a lower brightness, and lower power, emitter to be used. *Id.*

Petitioner disputes Patent Owner's characterization of Mendelson-2003 as purely experimental, and alleges that Mendelson-2003 makes clear that employing two rings outputting two signal streams is equivalent to employing a wider single ring of detectors, and provides associated benefits. *Id.* at 36–38 (citing, e.g., Ex. 1060 ¶ 70).

Patent Owner's Sur-reply

Patent Owner reiterates its position that Aizawa concerns individual monitoring, which Patent Owner alleges is a "key feature of Aizawa's sensor," in order to avoid problems associated with sensor displacement. PO Sur-reply 24–26. Patent Owner also reiterates its positions that the proposed modified sensor would consume more power, and that Aizawa's disclosed embodiment with eight detectors in a single ring would have been preferred. *Id.* at 26–29.

Analysis

We have considered the parties' arguments and cited evidence, and we are persuaded by Petitioner's contentions. As discussed above, Aizawa discloses a sensor with a first set of four phototransistors 22 as claimed, which are disposed in a single ring around central emitter 21. Ex. 1006 ¶ 23, Figs. 1(a)–1(b). Mendelson-2003 teaches a sensor with a dual-ring configuration, where a first inner ring includes six photodetectors, and a second outer ring includes an additional six photodetectors. Ex. 1024, 3017, Fig. 1. Mendelson-2003 also states that by using this dual-ring

configuration to simulate a wide photodetector area, stronger signals could be obtained, drive currents could be reduced, and battery life could be extended. *Id.* at 3019, Fig. 3, Fig. 4.

In light of these explicit teachings, we are persuaded by Petitioner's contention that a person of ordinary skill in the art would have found it obvious to include a second set of detectors in Aizawa's sensor, as taught by Mendelson-2003, to realize the benefits taught by Mendelson-2003, i.e., stronger signals with reduced power consumption. Pet. 17–18, 41–42. We credit Dr. Kenny's testimony that this would have been the use of a known solution—a sensor with dual detector rings as taught by Mendelson-2003— to improve similar systems—Aizawa's sensor with one detector ring—in the same way, which "would have led to predictable results without significantly altering or hindering the functions performed by Aizawa's sensor," especially where Aizawa itself discloses adding extra detectors to improve light collection efficiency. Ex. 1003 ¶ 74.

We also credit Dr. Kenny's testimony that, as taught by Mendelson-2003, it would have been obvious to connect the photodetectors of each set in parallel to provide first and second signal streams, respectively, and that this would have led to predictable results. Ex. 1003 ¶ 74 (predictable), 93–94 (first set), 102 (second set). Indeed, the two rings taught by Mendelson-2003 are disclosed as being "wired in parallel and connected through a central hub to the common summing input of a current-to-voltage converter." Ex. 1024, 3017. Dr. Kenny explains numerous advantages associated the parallel connections taught by Mendelson-2003, such as monitoring for displacement, accounting for motion artifacts, and

compensating for the relative decrease in light that reaches the outer ring, which cannot be achieved with a single signal stream. Ex. 1003 ¶¶ 95–97.

We have considered Patent Owner's arguments but find them to be misplaced. First, we do not agree that Aizawa discloses the ability to individually monitor individual detectors as a "key feature" (PO Resp. 56; PO Sur-reply 25) of its sensor. We discern no persuasive support for this position in Aizawa. Aizawa does not discuss individual monitoring at all, at least not clearly, and does not discuss individual monitoring as a solution to sensor displacement. Rather, Aizawa explains that its sensor includes four photodetectors 22 and that "reflected light is detected by the plurality of photodetectors 22." Ex. 1006 ¶¶ 23, 27. Aizawa also explains that its sensor includes a "drive detection circuit for detecting a pulse wave by amplifying the outputs of the photodetectors 22." *Id.* ¶ 23. These disclosures indicate that Aizawa does not monitor each photodetector 22 individually to ascertain the pulse wave but, rather, utilizes "the outputs" of *all* of the photodetectors together.

This understanding is consistent with Aizawa's disclosure of sensor displacement. As Patent Owner correctly notes, Aizawa recognizes a problem with sensor displacement, in which "no output signal can be obtained" if the sensor's detectors are placed away from an artery. *Id.* ¶ 7. Aizawa solves this problem by avoiding a "linear[]" detector arrangement, such that "[e]ven when the attachment position of the sensor is dislocated, a pulse wave can be detected accurately." *Id.* ¶ 9. Indeed, Aizawa is clear that, in its preferred embodiment, it is the disposition of photodetectors 22 in "a circle concentric to the light emitting diode 21" that enables accurate

IPR2020-01716
Patent 10,702,194 B1

pulse detection even when the sensor is dislocated. *Id.* ¶ 27. Aizawa does not discuss individual monitoring in relation to sensor dislocation.

We have examined Patent Owner's alleged support for the importance of individual monitoring and find it unavailing. *See, e.g.*, PO Resp. 57 (citing Ex. 1006 ¶¶ 7, 19, 23, 27–29, 32, 36; Ex. 2004 ¶ 102; Ex. 2026, 76:13–22, 79:22–80:3). Patent Owner identifies Figure 3, which depicts a "diagram of a pulse wave which is the output of *a photodetector*." Ex. 1006 ¶¶ 19 (emphasis added), 28 ("the above photodetector 22"). Patent Owner seems to place importance on the use of the article "a" or "the" photodetector, in the singular. PO Resp. 57; PO Sur-reply 24. However, we discern no significance in the singular use. In discussing this Figure, Aizawa does not discuss monitoring an individual photodetector, or describe that as a "key feature"; instead, Aizawa explains that drive detection circuit 24 amplifies the detected pulse wave and transmits it to arithmetic circuit 3, which compares it to a threshold value to calculate a pulse rate. Ex. 1006 ¶ 28. We discern that this discussion of how the circuits process a signal from "a" (or "the") photodetector is merely exemplary of the process; Patent Owner has not pointed to any persuasive support for its position that this somehow indicates a "key feature" of Aizawa is individual monitoring. As noted above, Aizawa plainly discloses that it is the signals from *the plurality* of photodetectors that are used to determine a pulse wave. *Id.* ¶¶ 23, 27. Nothing in Figure 3 or paragraph 28 clearly contradicts that disclosure.

We have considered the cited testimony of Dr. Madisetti, which Patent Owner relies upon as support for its position, but we find it unavailing as well. Dr. Madisetti's testimony includes the same citations presented by Patent Owner, none of which demonstrates individual

35

monitoring.  Ex. 2004 ¶ 102.  Thus, we determine this testimony to be conclusory and entitled to little weight.

We do recognize, as did Dr. Kenny during his deposition, that Aizawa does not provide extensive discussion of the algorithms through which Aizawa determines a pulse wave.  *See, e.g.*, Ex. 2026, 80:8–18 ("It doesn't describe the algorithm in detail.  It just says amplifies the signals from the detectors and then performs whatever function takes place inside the arithmetic circuit which I think computes the number of times the signal crosses the threshold value to calculate the pulse rate, but there's not a clearly described precise algorithm for what goes on.  It's left for one of ordinary skill in the art to process the waveforms and, and count the crossings of the threshold and determine the pulse rate.").  Nonetheless, we decline Patent Owner's invitation to import into Aizawa's disclosure a "key feature" of individual monitoring that is not identified by Aizawa with any reasonable clarity.  Again, as noted above, Dr. Madisetti provides no further support for the conclusory position advanced by Patent Owner.

By contrast, we credit Dr. Kenny's testimony, which is consistent with Aizawa's express disclosure of detecting a pulse wave from "the plurality of photodetectors" (Ex. 1006 ¶ 27), that:

> connecting multiple photodetectors together in parallel allows the current generated by the multiple photodetectors to be added to one another, which would subsequently ensure that even if one of multiple sensors connected in parallel were to be displaced so as to receive no signal, the fact that all the sensors are connected in parallel such that their signals are summed means that a signal will still be detected, in accordance with Aizawa's objective.

Ex. 1060 ¶ 62.  Moreover, we agree with Dr. Kenny that "there is no disclosure anywhere in Aizawa to suggest that it is even capable of

IPR2020-01716
Patent 10,702,194 B1

somehow monitoring the signals of each photodetector, and there is certainly
no need to do so if its sensors are connected in parallel." *Id.* Thus,
considering the express disclosure of Aizawa and the competing testimony
of the parties' experts, we credit that of Dr. Kenny.

Patent Owner's second argument—that the proposed modification
would have resulted in increased power consumption—is plainly
contradicted by Mendelson-2003's disclosure. Table 1 of Mendelson-2003
is reproduced below.

**Table 1**. Comparison of estimated battery life for different PD configurations.
Values based on forehead measurements for a typical 220mAhr coin size battery.

| PD CONFIGURATION | BATTERY LIFE [Days] |
|---|---|
| Near | 45.8 |
| Far | 20.3 |
| Near+Far | 52.5 |

Table 1 includes three rows, each associating a different photodetector
configuration with an estimated battery life. Ex. 1024, 3019. The table
indicates that a configuration consisting of only a near ring of photodetectors
results in 45.8 days of battery life; a configuration consisting of only a far
ring of photodetectors results in 20.3 days of battery life; and a configuration
consisting of both a near ring and a far ring of photodetectors results in
52.5 days of battery life. *Id.* In describing this table, Mendelson-2003
states, "the considerable differences in the estimated power consumptions
clearly points out the practical advantage gained by using a reflection sensor
comprising a large ring-shaped PD area to perform $SpO_2$ measurements,"
which in this case, was realized by the combination of a near and far ring of
detectors, akin to the modification proposed by Petitioner. *Id.* Thus, we do
not agree with Patent Owner's argument that power consumption would

IPR2020-01716
Patent 10,702,194 B1

increase if a second ring of detectors were added to Aizawa's sensor; Mendelson-2003 plainly suggests the opposite and supports Petitioner's contention that the proposed modification would result in a power savings over a single ring.

We also do not agree with the argument that a person of ordinary skill in the art would not make the proposed modification because Aizawa already discloses a way to improve detection efficiency, e.g., by including more detectors in a single ring. PO Resp. 60 (citing Ex. 1006 ¶ 32, Fig. 4A; Ex. 2004 ¶ 107). Aizawa explains that the photodetector arrangement of its single-ring preferred embodiment "is not limited" and suggests, "[f]or example," that "the number of photodetectors 22 may be increased." Ex. 1006 ¶ 32. Aizawa does not limit the increase in photodetectors to being included in only the existing single ring of detectors, i.e., the first set. Nothing in this disclosure teaches against adding a second set, as proposed by Petitioner for the well-supported reasons identified in Mendelson-2003 and further discussed by Dr. Kenny.

Patent Owner's third argument—that Mendelson-2003 is experimental and would not provide the alleged benefits—likewise fails. Patent Owner's suggestion that Mendelson-2003 teaches using a single large, wide detector ring that outputs a single signal stream is unfounded. The analysis provided in Mendelson-2003 explicitly compares a dual-ring arrangement to both a single near ring and a single far ring. *See, e.g.*, Ex. 1024, Fig. 3, Fig. 4, Table 1 (all comparing near, far, and near + far arrangements). Mendelson-2003 explains that the dual-ring arrangement "simulate[s] a single large PD area" and realizes benefits in LED power requirements. *Id.* at 3019. That

38

Mendelson-2003 *simulates* a single ring by using two discrete rings demonstrates the fallacy of Patent Owner's argument.

Finally, we disagree with Patent Owner's argument that a person of ordinary skill in the art would not have made the proposed combination because it "introduces signal processing problems requiring a ***further*** redesign for Aizawa's sensor" to include a second amplifier to account for signals of different strengths between the near and far rings. PO Resp. 65–66. A person of ordinary skill in the art must be presumed to understand something about the art beyond what is disclosed in the references. *See In re Jacoby*, 309 F.2d 513, 516 (CCPA 1962). After all, "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007). Neither Patent Owner nor Dr. Madisetti asserts that adding a second amplifier would be beyond the level of skill in the art or would introduce any specific problems, beyond its mere addition. We credit Dr. Kenny's testimony that a person of ordinary skill would have recognized that, in order to account for the disparate currents generated by the two rings, the rings would be separately wired with separate amplifiers (Ex. 1003 ¶ 97) and that this would have been a routine and conventional design choice, within the level of ordinary skill in the art (*id.* ¶ 94).

For the foregoing reasons, we are persuaded by Petitioner's contentions.

> vi.    "*[f] each of the photodiodes of the first set of photodiodes has a corresponding window that allows light to pass through to the photodiode*"
> and
> "*[j] each of the photodiodes of the second set of*

> *photodiodes has a corresponding window that allows
> light to pass through to the photodiode"*

The cited evidence supports Petitioner's undisputed contention that Aizawa teaches windows corresponding to each detector of Aizawa, i.e., "tapered cavities that provide an opening for each of the detectors (e.g., each of the photodiodes of the first set of photodiodes) and that serve to increase, for instance, the concentration of light collected by the detectors, thereby increasing the signal to noise ratio," and that a person of ordinary skill in the art also would have provided such windows for the second set of photodiodes, suggested by the combination with Mendelson-2003. Pet. 38–40, 42; *see, e.g.*, Ex. 1006 ¶¶ 23 ("four phototransistors 22"), 24 ("stored in cavities" and "set back from . . . detection face 23a"), Figs. 1(a)–1(b) (depicting cavities 23c housing detectors 22); Ex. 1003 ¶¶ 98–99, 103.

> vii.    *"[k] a wall that surrounds at least the first and
> second sets of photodiodes"*

The cited evidence supports Petitioner's undisputed contention that Aizawa discloses holder 23, which includes a wall that surrounds the photodetectors, as well as other elements. Pet. 42–44; *see, e.g.*, Ex. 1006 ¶ 23 ("holder 23 for storing . . . light emitting diode 21 and the photodetectors 22"), Fig. 1(b) (depicting holder 23 surrounding the detector).

> viii.    *"[l] a cover comprising a protruding convex surface,
> wherein the protruding convex surface is above all of
> the photodiodes of the first and second sets of
> photodiodes, wherein at least a portion of the*

IPR2020-01716
Patent 10,702,194 B1

> *protruding convex surface is rigid, and wherein the*
> *cover is above the wall"*

Petitioner's Undisputed Contentions

Petitioner contends that Aizawa "teaches a light permeable cover in the form of an acrylic transparent plate 6 . . . that is mounted at the detection face 23a" of the sensor, i.e., above Aizawa's photodetectors, to provide "improved adhesion between the detector and the wrist to 'further improv[e] the detection efficiency of a pulse wave.'" Pet. 9–10 (citing Ex. 1006 ¶ 30, Fig. 1(b); Ex. 1003 ¶¶ 53–54). Patent Owner does not dispute this contention, and we agree with Petitioner. Aizawa discloses that "acrylic transparent plate 6 is provided on the detection face 23a of the holder 23 to improve adhesion to the wrist 10." Ex. 1014 ¶ 34, Fig. 1(b) (depicting transparent plate 6 between sensor 2 and wrist 10).

Petitioner also contends that Ohsaki teaches a wrist-worn sensor that includes a "translucent board" having a convex surface that contacts the user's skin. Pet. 12–13, 22–23. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki discloses that sensor 1 includes detecting element 2 and sensor body 3, and is "worn on the back side of the user's wrist." Ex. 1014 ¶ 16. Ohsaki discloses that detecting element 2 includes package 5 and "translucent board 8[,which] is a glass board which is transparent to light, [and is] attached to the opening of the package 5. A convex surface is formed on the top of the translucent board 8." *Id.* ¶ 17. As seen in Ohsaki's Figure 2, translucent board 8 has a protruding convex surface, and is located above all of the detectors. *Id.* ¶ 17 ("The translucent board 8 is . . . attached to the opening of the package 5."), Fig. 2.

Petitioner also contends that Ohsaki's Figure 2 depicts the user's tissue conforming to the shape of the convex surface of the cover, such that the convex surface would have been "rigid." Pet. 45–46. Patent Owner does not dispute this contention, and we agree with Petitioner. Ohsaki's Figure 2 depicts the user's tissue 4 conforming to the shape of the protruding convex surface when the sensor is worn by the user. Ex. 1014 ¶ 17 ("The translucent board 8 is a glass board."), Fig. 2; *see, e.g.*, Ex. 1003 ¶¶ 107– 108.

Petitioner's Disputed Contentions

Petitioner further contends that a person of ordinary skill in the art would have found it obvious "to modify the sensor's flat cover [in Aizawa] . . . to include a lens/protrusion . . . similar to Ohsaki's translucent board 8, so as to [1] improve adhesion between the user's wrist and the sensor's surface, [2] improve detection efficiency, and [3] protect the elements within sensor housing." Pet. 24–25 (citing, e.g., Ex. 1003 ¶ 78; Ex. 1014 ¶ 25), 44 (citing, e.g., Ex. 1003 ¶ 105). Petitioner contends that Ohsaki's convex surface is in "intimate contact" with the user's tissue, which prevents slippage of the sensor and increases signal strength because "variation of the amount of the reflected light . . . that reaches the light receiving element 7 is suppressed" and because "disturbance light from the outside" is prevented from penetrating board 8, as compared to a sensor with a flat surface. *Id.* at 22–24 (citing, e.g., Ex. 1003 ¶¶ 76–77; quoting Ex. 1014 ¶¶ 15, 17, 25).

Petitioner contends this modification would have been "nothing more than the use of a known technique to improve similar devices in the same way," i.e., "simply improving Aizawa-Mendelson-2003's transparent plate 6

IPR2020-01716
Patent 10,702,194 B1

that has a flat surface to improve adhesion to a subject's skin and reduce variation in the signals detected by the sensor." Pet. 25 (citing Ex. 1003 ¶ 79). Further according to Petitioner, "the elements of the combined system would each perform functions they had been known to perform prior to the combination—Aizawa-Mendelson-2003's transparent plate 6 would remain in the same position, performing the same function, but with a convex surface as taught by Ohsaki." *Id.* at 26.

To illustrate its proposed modification, Petitioner includes two annotated versions of Aizawa's Figure 1(b), both of which are reproduced below. Pet. 25.



Petitioner's annotated figure on the left depicts Aizawa's sensor, modified to include LED B (*see supra* Section II.D.5.iii) and with a flat "light permeable cover" (illustrated with blue outline); Petitioner's annotated figure on the right depicts Aizawa's sensor, again modified to include LED B (*see supra* Section II.D.5.iii) and with a convex "light permeable cover" (also illustrated with blue outline). Petitioner contends that, in the combination, the convex surface is above the wall provided by the holder. Pet. 45 (citing, e.g., Ex. 1003 ¶ 106).

Petitioner also identifies Japanese Patent Application 2006-296564 to Inokawa (Ex. 1007 (Japanese language); Ex. 1008 (English language

IPR2020-01716
Patent 10,702,194 B1

translation)), which Petitioner contends "provides an additional motivation and rationale . . . to modify Aizawa to include a cover comprising a protruding convex surface." Pet. 26. According to Petitioner, Inokawa teaches a convex lens that "increase[s] the light-gathering ability of the LED." *Id.* (citing Ex. 1008 ¶ 15, Fig. 2). Petitioner contends that, in view of Inokawa, a person of ordinary skill in the art would have understood how to implement Ohsaki's convex surface in Aizawa. *Id.* at 27–28 (citing Ex. 1003 ¶¶ 82–83).

Patent Owner's Arguments

Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Aizawa's sensor to include Ohsaki's convex cover. PO Resp. 24–55;[5] PO Sur-reply 3–23.

First, Patent Owner argues that the proposed modification "fundamentally changes Ohsaki's structure and eliminates the longitudinal shape that gives Ohsaki's translucent board the ability to prevent slipping." PO Resp. 25. This argument is premised on Patent Owner's contention that Ohsaki's convex cover must be rectangular, with the cover's long direction

---

[5] As an initial matter, Patent Owner observes that Petitioner "[r]eli[es] on a non-ground reference, Inokawa," as providing the rationale for the proposed modification of Aizawa in view of Ohsaki, and as providing implementation details of the combination. PO Resp. 24 (citing Pet. 26–27); *id.* at 46–47, 52–55. We discern no error in Petitioner's identification of Inokawa. The nature of Petitioner's reliance on Inokawa in support of this ground is explained clearly in the Petition, even if Inokawa is not listed as an additional reference in the identification of the ground. Thus, the Petition complies with 35 U.S.C. § 312(a)(3) (stating an IPR petition must "identif[y], in writing and with particularity . . . the grounds on which the challenge to each claim is based, and the evidence that supports the grounds for the challenge").

IPR2020-01716
Patent 10,702,194 B1

aligned with the length of the user's forearm, to avoid interacting with bones in the wrist and forearm. *Id.* at 26–28 (citing, e.g., Ex. 2004 ¶¶ 53–57; Ex. 1014 ¶¶ 6, 19, 23, 24). According to Patent Owner, Ohsaki teaches that "aligning the sensor's longitudinal direction with the ***circumferential*** direction of the user's arm undesirably results in 'a tendency [for Ohsaki's sensor] to slip off.'" *Id.* at 28 (citing Ex. 1014 ¶ 19).

Thus, Patent Owner contends that Petitioner's proposed modification would "chang[e] Ohsaki's longitudinal detecting element and rectangular board into a circular shape[, which] would eliminate the advantages discussed above" because a circular shape "cannot be placed in ***any longitudinal*** direction and thus cannot coincide with the longitudinal direction of the user's wrist." *Id.* at 28 (citing Ex. 2004 ¶¶ 57–58). Patent Owner presents annotated Figures depicting what it contends is Ohsaki's disclosed sensor placement as compared to that of the proposed modification, reproduced below. *Id.* at 29.



Patent Owner's annotated Figure on the left depicts a rectangular sensor placed between a user's radius and ulna, while Patent Owner's annotated Figure on the right depicts a circular sensor placed across a user's radius and

ulna.  Based on these annotations, Patent Owner argues that the proposed
"circular shape would press on the user's arm in all directions and thus
cannot avoid the undesirable interaction with the user's bone structure," such
that a skilled artisan "would have understood such a change would eliminate
Ohsaki's benefit of preventing slipping."  *Id.* at 31 (citing, e.g., Ex. 2004
¶¶ 57–58), 31 (citing Ex. 2004 ¶¶ 55–62).[6]

Second, Patent Owner argues that Ohsaki requires its sensor be placed
on the back of the user's wrist to achieve any benefits, but that such a
location would have been unsuitable for Aizawa's sensor.  PO Resp. 34.
Specifically, Patent Owner argues that Aizawa's sensor must be worn on the
palm side of the wrist, close to radial and ulnar arteries, which is the side
opposite from where Ohsaki's sensor is worn.  *Id.* at 35–40 (citing, e.g.,
Ex. 2004 ¶¶ 67–74).  According to Patent Owner, Ohsaki teaches that the
sensor's convex surface has a tendency to slip when placed on the palm side
of the wrist, i.e., in the location taught by Aizawa.  *Id.* at 40–43 (citing, e.g.,
Ex. 1014 ¶¶ 19, 23, 24; Ex. 2004 ¶¶ 75–81).  Thus, Patent Owner argues that
a person of ordinary skill in the art "would not have been motivated to use
Ohsaki's longitudinal board—designed to be worn on the ***back side*** of a
user's wrist—with Aizawa's ***palm-side*** sensor."  *Id.* at 43.  Similarly, Patent
Owner argues that Aizawa teaches away from the proposed modification
because Aizawa teaches that its flat acrylic plate improves adhesion on the

---

[6] Patent Owner further argues, "[t]o the extent Petitioner contends a [person
of ordinary skill in the art] would use Ohsaki's ***rectangular*** board on
Aizawa's circular sensor . . . this argument is unsupported and incorrect."
PO Resp. 31.  We do not read the Petition as making such a contention.  We
understand Petitioner to propose, in essence, changing Aizawa's circular *flat*
cover into a circular *convex* cover.  *See, e.g.*, Pet. 25.

palm side of the wrist, while Ohsaki teaches that its convex board "has a tendency to slip" on the palm side of the wrist. *Id.* at 43–46 (citing, e.g., Ex. 2004 ¶¶ 82–85).

Third, Patent Owner argues that a person of ordinary skill in the art would not have placed Ohsaki's convex cover over Aizawa's peripheral detectors because the convex cover would condense light toward the center and away from Aizawa's detectors, which would decrease signal strength. PO Resp. 46–54 (citing, e.g., Ex. 2004 ¶¶ 86–97). Patent Owner also contends that Petitioner and Dr. Kenny admitted as much in a related proceeding. *Id.* at 47–48 (citing, e.g., Ex. 2019, 45; Ex. 2020, 69–70). Patent Owner also relies on Figure 14B of the '194 patent to support its position. *Id.* at 48–49 (citing Ex. 1001, 36:3–6, 36:13–15). Additionally, Patent Owner argues that its position is also supported by Inokawa, which also uses a convex lens to direct light toward the center but, in Inokawa's structure, the light is directed from peripheral emitters toward a central detector. *Id.* at 52–54 (citing, e.g., Ex. 1008 ¶¶ 15, 58). In light of the foregoing, Patent Owner argues that a person of ordinary skill in the art would have understood that the proposed modification would have decreased signal strength by directing light away from Aizawa's peripheral detectors. *Id.* at 49–51.

Fourth and finally, Patent Owner argues that a person of ordinary skill in the art "would have understood that Aizawa's *flat* plate would provide better protection than a convex surface" because it "would be less prone to scratches." *Id.* at 54–55 (citing Ex. 1008 ¶ 106; Ex. 2004 ¶¶ 98–99).

IPR2020-01716
Patent 10,702,194 B1

Petitioner's Reply

Concerning Patent Owner's first and second arguments, Petitioner responds that Ohsaki does not disclose the shape of its protrusion, other than its convexity as shown in Figures 1 and 2, nor does Ohsaki require a rectangular shape or placement on the back of the wrist in order to achieve the disclosed benefits.  Pet. Reply 13–20 (citing, e.g., Ex. 1060 ¶¶ 18–30). Moreover, Petitioner asserts that "even if Ohsaki's translucent board 8 were understood to be rectangular, obviousness does not require 'bodily incorporation' of features from one reference into another"; rather, a person of ordinary skill in the art "would have been fully capable of modifying Aizawa to feature a light permeable protruding convex cover to obtain the benefits" taught by Ohsaki.  *Id.* at 16 (citing, e.g., Ex. 1060 ¶ 23).  Similarly, regarding the location of the sensor, Petitioner asserts,

> [E]ven assuming for the sake of argument that a [person of ordinary skill in the art] would have understood Aizawa's sensor as being limited to placement on the backside of the wrist, and would have understood Ohsaki's sensor's "tendency to slip" when arranged on the front side as informing consideration of Ohsaki's teachings with respect to Aizawa, that ***would have further motivated*** the [person of ordinary skill in the art] to implement a light permeable convex cover in Aizawa's sensor, to improve detection efficiency of that sensor when placed on the palm side.

*Id.* at 18 (citing, e.g., Ex. 1060 ¶ 27).  In other words, Ohsaki's disclosure that a convex surface suppresses variation in reflected light would have motivated an artisan to add such a surface to Aizawa to improve detection efficiency of that sensor when placed on the palm side.  *Id.* at 18–20. Moreover, Petitioner replies that the proposed convex surface "would provide an additional adhesive effect that would reduce the tendency of that

plate to slip, among other things since it is well-understood that physically digging into the skin with a protrusion provides an additional adhesive effect." *Id.* at 20 (citing Ex. 1060 ¶ 30).

Concerning Patent Owner's third argument, Petitioner responds that Patent Owner's argument about a convex cover directing light to the center is belied by Ohsaki itself, which uses a convex cover over a non-centrally located detector. *Id.* (citing Ex. 1060 ¶ 31); *id.* at 30–31. According to Petitioner, Ohsaki demonstrates that even if a convex cover decreased signal strength (which it disputes), the additional benefit of reduced slippage would have been recognized by a skilled artisan. *Id.*

Further, Petitioner responds that adding a convex cover to Aizawa's sensor would not decrease signal strength but, instead, "would improve Aizawa's signal-to-noise ratio by causing more light backscattered from tissue to strike Aizawa's photodetectors than would have with a flat cover" because such a cover improves light concentration across the entire lens and does not direct it only towards the center. *Id.* at 21–22 (citing, e.g., Ex. 1060 ¶¶ 31–34).

Petitioner asserts that Patent Owner and Dr. Madisetti "ignore[] the well-known optical ***principle of reversibility***," by which "a ray going from P to S will trace the same route as one from S to P" such that "rays that are not completely absorbed by user tissue will propagate in a reversible manner." Pet. Reply 22 (quoting Ex. 1061, 92; citing, e.g., Ex. 1061, 87–92; Ex. 1062, 106–111; Ex. 1060 ¶ 35). When applied to Aizawa's sensor, Petitioner contends that any condensing benefit achieved by a convex cover would thus direct emitted light toward Aizawa's peripheral detectors. *Id.* at 23–25 (citing, e.g., Ex. 1060 ¶¶ 35–44). Petitioner explains that this principle of

reversibility is recognized in Aizawa.  *Id.* at 25 (citing, e.g., Ex. 1060 ¶¶ 41–44; citing Ex. 1006 ¶ 33).

Petitioner also asserts that Patent Owner and Dr. Madisetti overlook the fact that light rays reflected by body tissue will be scattered and diffuse and will approach the detectors "from various random directions and angles."  Pet. Reply 29 (citing, e.g., Ex. 1023, 52, 86, 90; Ex. 1056, 803; Ex. 1060 ¶¶ 46–49; Ex. 2006, 163:12–164:2).  This scattered and diffuse light, according to Petitioner, means that Ohsaki's convex cover cannot focus light to the center of the sensor device, as Patent Owner argues.  *Id.* at 26.  Instead, due to the random nature of this scattered light, Petitioner asserts that a person of ordinary skill in the art would have understood that "Ohsaki's convex cover provides a slight refracting effect, such that light rays that otherwise would have missed the detection area are instead directed toward that area as they pass through the interface provided by the cover."  *Id.* (citing, e.g., Ex. 1060 ¶¶ 48–49).  Petitioner applies this understanding to Aizawa, and asserts that using a cover with a convex protrusion in Aizawa would "enable backscattered light to be detected within a circular active detection area surrounding" a central light source.  *Id.*

Petitioner relies upon the following illustration of this alleged effect.  Pet. Reply 29–30 (citing Ex. 1060 ¶¶ 54–55).

IPR2020-01716
Patent 10,702,194 B1



APPLE-1061, 141 (annotated)

The above illustration depicts backscattered light reflecting off user tissue and toward a convex board from various angles. *Id.* at 29. According to Petitioner, "[t]his pattern of incoming light cannot be focused by a convex lens towards any single location," and, instead, "light rays that otherwise would have missed the active detection area are instead directed toward that area as they pass through the interface provided by the convex cover." *Id.* at 29–30.

Finally, Petitioner dismisses Patent Owner's reliance on Figure 14B of the '194 patent because it "is not an accurate representation of light that has been reflected from a tissue measurement site. The light rays (1420) shown in FIG. 14B are collimated (i.e., parallel to one another), and each light ray's path is perpendicular to the detecting surface." Pet. Reply 28–29 (citing, e.g., Ex. 1060 ¶¶ 51–53).

Concerning Patent Owner's fourth argument, Petitioner responds that even if a flat surface might be less prone to scratching, that possible disadvantage would have been weighed against the "known advantages of applying Ohsaki's teachings," and would not negate a motivation to

IPR2020-01716
Patent 10,702,194 B1

combine. *Id.* at 32 (citing, e.g., Ex. 1060 ¶ 60). Moreover, Petitioner argues that "by choosing a suitable material of the protrusion to be scratch-resistant, it would have been obvious for a [person of ordinary skill in the art] to achieve both benefits (light gathering and scratch-resistance) at once." *Id.*

Patent Owner's Sur-reply

Concerning Patent Owner's first and second arguments, Patent Owner reiterates its position that Ohsaki's purported benefits attach only to a sensor with a rectangular convex surface that is located on the back of the wrist, and that "even small changes in its sensor's orientation or body location result in 'a tendency to slip.'" PO Sur-reply 3–14, 6.

Concerning Patent Owner's third argument, Patent Owner asserts that Petitioner's Reply improperly presents several new theories as compared with the Petition. *Id.* at 16 (regarding reversibility), 19 (regarding refraction).

Patent Owner argues that Dr. Kenny and Petitioner have not overcome their admissions that a convex lens directs light toward the center. *Id.* at 15. Moreover, Patent Owner argues that Petitioner's discussion of the principle of reversibility is "irrelevant" because "Petitioner never explains how the principle of reversibility could apply to such 'random' scattered and absorbed light" as is present when light interacts with user tissue. *Id.* at 16–17. The random nature of backscattered light, in Patent Owner's view, "hardly supports Petitioner's argument that light will necessarily travel the same paths regardless of whether the LEDs and detectors are reversed," and is irrelevant to the central issue presented here of "whether changing Aizawa's flat surface to a convex surface results in more light on Aizawa's peripherally located detectors." *Id.* at 17–18.

Patent Owner also asserts that Petitioner mischaracterizes Patent Owner's position, which is not that a cover with a convex protrusion "focuses *all* light to a single point" at the center of the sensor as Petitioner characterizes it.  PO Sur-reply 19.  Patent Owner's position, rather, is that Petitioner has not shown that a person of ordinary skill in the art "would have been motivated to change Aizawa's flat surface to a convex surface to improve signal strength." *Id.*  In Patent Owner's view, by arguing that the convex cover provides only a "*slight* refracting effect," Petitioner undermines its contention that providing such a cover would have improved detection efficiency. *Id.* at 20.

Moreover, Patent Owner argues that Petitioner's theory regarding the "slight refracting effect" of a convex protrusion is "unavailing because it fails to consider the greater *decrease* in light at the detectors due to light redirection to a *more* central location." *Id.* at 20.  According to Patent Owner, any light redirected from the sensor's edge could not make up for the loss of signal strength from light redirected away from the detectors and toward the center. *Id.*

Concerning Patent Owner's fourth argument, Patent Owner argues that Petitioner does not dispute Patent Owner's position that a flat cover would be less prone to scratches and offers "*no* plausible advantages for its asserted combination." *Id.* at 23.  Moreover, Patent Owner argues that "[t]he risk of scratches undermines Petitioner's argument that a [person of ordinary skill in the art] would have been motivated to add a convex cover to 'protect the elements within the sensor housing.'" *Id.*

IPR2020-01716
Patent 10,702,194 B1

Analysis

As noted above, Petitioner provides three rationales to support its contention that a person of ordinary skill in the art would have modified Aizawa's flat cover to include a protruding convex surface, such as that taught by Ohsaki, to (1) improve adhesion between the sensor and the user's tissue, (2) improve detection efficiency, and (3) protect the elements within the sensor housing.  Pet. 24–25.  We conclude all three rationales are supported by the evidence, as follows.

Rationales 1 and 2

The evidence of record persuades us that adding a convex protruding surface, such as that taught by Ohsaki, to Aizawa's cover would have improved adhesion between the sensor and the user's skin, which would have increased the signal strength of the sensor.  Ohsaki teaches as much:

> [T]he convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin.  Thereby *it is prevented that the detecting element 2 slips off* the detecting position of the user's wrist 4.  If the translucent board 8 has a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4 as shown in Fig. 4B.  However, in the case that the translucent board 8 has a convex surface like the present embodiment, the *variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed.  It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8*.  Therefore the pulse wave can be detected without being affected by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1014 ¶ 25 (emphases added); *see also id.* ¶ 27 ("stably fixed").

We credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated by such teachings to apply a cover with a

IPR2020-01716
Patent 10,702,194 B1

convex surface to Aizawa to improve that similar device in the same way and to yield predictable results, i.e., to resist movement of the sensor on the user's wrist.  *See, e.g.*, Ex. 1003 ¶¶ 76 ("[T]his contact between the convex surface and the user's skin is said to prevent slippage, which increases the strength of the signals obtainable by Ohsaki's sensor."), 78–79.  We also credit Dr. Kenny's testimony that, in light of these teachings, a person of ordinary skill in the art would have made such a modification to improve the pulse sensor's ability to emit light into, and detect light reflected from, the user's wrist, to generate an improved pulse signal.  Ex. 1003 ¶¶ 76–78; Ex. 1060 ¶¶ 13, 29.

Indeed, Ohsaki expressly compares the performance of a wrist-worn pulse wave sensor depending on whether translucent board 8 is convex or flat, and concludes the convex surface results in improved performance over the flat surface, especially when the user is moving.  Ex. 1014, Figs. 4A–4B, ¶¶ 15, 25 (stating that with "a flat surface, the detected pulse wave is adversely affected by the movement of the user's wrist 4," and with "a convex surface like the present embodiment, the variation of the amount of the reflected light" collected by the sensor "is suppressed").  Ohsaki also states that, with a convex surface, "[i]t is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8."  *Id.* ¶ 25.

We also credit Dr. Kenny's testimony that the proposed modification would have been within the skill level of an ordinary artisan.  For example, Dr. Kenny testifies:

> [A person of ordinary skill in the art] would have combined the teachings of Aizawa-Mendelson-2003 and Ohsaki as doing so would have amounted to nothing more than the use

IPR2020-01716
Patent 10,702,194 B1

> of a known technique to improve similar devices in the same
> way. For instance, [a person of ordinary skill in the art] would
> have recognized that incorporating Ohsaki's convex surface is
> simply improving Aizawa-Mendelson-2003's transparent plate 6
> that has a flat surface to improve adhesion to a subject's skin and
> reduce variation in the signals detected by the sensor.
> Furthermore, the elements of the combined system would each
> perform similar functions they had been known to perform prior
> to the combination. That is, Aizawa-Mendelson-2003's
> transparent plate 6 would remain in the same position,
> performing the same function, but with a convex surface as
> taught by Ohsaki.

Ex. 1003 ¶ 79. In light of Ohsaki's express disclosure of the benefits of a convex cover, we credit Dr. Kenny's testimony that a person of ordinary skill in the art would have been motivated to modify Aizawa as proposed, and would have had a reasonable expectation of success in doing so.

We next address Patent Owner's first through third arguments, each of which implicates Petitioner's first and second asserted rationales of improved adhesion and detection efficiency.

Patent Owner's first argument is premised on the notion that Ohsaki's benefits only can be realized with a rectangular convex surface, because such a shape is required to avoid interacting with bones on the back of the user's forearm. PO Resp. 25–34. We disagree. Ohsaki does not disclose the shape of its convex cover, much less require it be rectangular. In fact, Ohsaki is silent as to the shape of the convex surface. Ohsaki discloses that sensor 1 includes detecting element 2, which includes package 5 within which the sensor components are located. Ex. 1014 ¶ 17. Ohsaki's convex surface is located on board 8, which is "attached to the opening of the package 5." *Id.* Ohsaki provides no further discussion regarding the shape of board 8 or its convex protrusion.

IPR2020-01716
Patent 10,702,194 B1

We disagree with Patent Owner's suggestion that the shape of the convex surface can be inferred to be rectangular from Ohsaki's Figures 1 and 2. PO Resp. 18–20. Ohsaki does not indicate that these figures are drawn to scale, or reflect precise dimensions or shapes of the convex surface. *See, e.g.*, Ex. 1014 ¶ 13 ("schematic diagram"); Pet. Reply 14–15; *Hockerson-Halberstadt, Inc. v. Avia Group Int'l*, 222 F.3d 951, 956 (Fed. Cir. 2000) ("[I]t is well established that patent drawings do not define the precise proportions of the elements and may not be relied on to show particular sizes if the specification is completely silent on the issue.").

To be clear, Ohsaki describes the shape of *detecting element 2* as rectangular: "[T]he length of the detecting element from the right side to the left side in FIG. 2 is longer than the length from the upper side to the lower side." Ex. 1014 ¶ 19. Ohsaki also describes that detecting element 2 is aligned longitudinally with the user's forearm: "[I]t is desirable that the detecting element 2 is arranged so that its longitudinal direction agrees with the longitudinal direction of the user's arm," to avoid slipping off. *Id.*; *see also id.* ¶ 9 ("The light emitting element and the light receiving element are arranged in the longitudinal direction of the user's arm.").

In light of this disclosed rectangular shape of detecting element 2, it is certainly possible that Ohsaki's convex surface may be similarly shaped. But, it may not be. Contrary to Patent Owner's argument, Ohsaki neither describes nor requires detecting element 2 to have the same shape as the convex surface of board 8. *Accord* Pet. Reply. 13–14. We have considered the testimony of both Dr. Kenny and Dr. Madisetti on this point. Ex. 1060 ¶¶ 10, 12, 18–23; Ex. 2004 ¶¶ 36–39 (relying on Ohsaki's Figures 1–2 to support the opinion that the convex surface is rectangular). Dr. Madisetti's

IPR2020-01716
Patent 10,702,194 B1

reliance on the dimensions of Ohsaki's figures is unpersuasive. *Hockerson-Halberstadt*, 222 F.3d at 956. We credit Dr. Kenny's testimony that Ohsaki does not describe its convex surface as rectangular, because this testimony is most consistent with Ohsaki's disclosure.

Further, Patent Owner suggests that the convex surface *must be* rectangular, in order to avoid interacting with bones in the user's forearm. PO Resp. 26–28; PO Sur-reply 10 ("[A] POSITA would have understood Ohsaki's convex board must ***also*** have a longitudinal shape oriented up-and-down the watch-side of the user's wrist/forearm."). Although Ohsaki recognizes that interaction with these bones can cause problems, (*see* Ex. 1014 ¶¶ 6, 19), we do not agree that the *only way* to avoid these bones is by aligning a rectangular cover with the longitudinal direction of the user's forearm. For example, in the annotated Figures provided by Patent Owner, *see* PO Resp. 29, we discern that the circular sensor that purports to depict the proposed modification would *also* avoid the bones in the forearm if it were slightly smaller. Patent Owner provides no persuasive explanation to justify the dimensions it provides in this annotated figure, or to demonstrate that such a large sensor would have been required. Indeed, we discern that it would have been within the level of skill of an ordinary artisan to appropriately size a modified sensor to avoid these well-known anatomical obstacles. *See, e.g.*, Ex. 1060 ¶ 25 ("The gap between the ulna and radius bones at the forearm is even greater than the gap between bones at the wrist, which is already wide enough to easily accommodate a range of sensor sizes and shapes, including circular shapes."). "A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 421.

After all, an artisan must be presumed to know something about the art apart from what the references disclose.  *See In re Jacoby*, 309 F.2d at 516.

Finally, we do not agree with Patent Owner's position that Ohsaki's advantages apply only to rectangular convex surfaces.  As discussed, Patent Owner has not shown that Ohsaki's convex surface is rectangular at all.  Moreover, even if Ohsaki's convex surface is rectangular, when discussing the benefits associated with a convex cover, Ohsaki does not limit those benefits to a cover of any particular shape.  Instead, Ohsaki explains that "detecting element 2 is arranged on the user's wrist 4 so that the convex surface of the translucent board 8 is in intimate contact with the surface of the user's skin.  Thereby it is prevented that the detecting element 2 slips off the detecting position of the user's wrist 4."  Ex. 1014 ¶ 25; Ex. 1060 ¶¶ 10 ("Ohsaki does not limit its benefits to a rectangular sensor applied to a particular body location, and a [person of ordinary skill in the art] would not have understood those benefits as being so limited."), 12.  Thus, we agree with Petitioner that Ohsaki's teaching of a convex surface would have motivated a person of ordinary skill in the art to add such a surface to Aizawa's circular-shaped sensor, to improve adhesion as taught by Ohsaki.  Nothing in Ohsaki's disclosure limits such a benefit to a specific shape of the convex surface.  Ex. 1060 ¶¶ 10–23.

Moreover, Ohsaki contrasts the ability to properly receive reflected light with a convex surface as compared to a flat surface and notes that,

> in the case that the translucent board 8 has a convex surface . . . the variation of the amount of the reflected light which is emitted from the light emitting element 6 and reaches the light receiving element 7 by being reflected by the surface of the user's skin is suppressed.  It is also prevented that noise such as disturbance light from the outside penetrates the translucent board 8.

IPR2020-01716
Patent 10,702,194 B1

> Therefore the pulse wave can be detected without being affected
> by the movement of the user's wrist 4 as shown in FIG. 4A.

Ex. 1014 ¶ 25; Ex. 1060 ¶¶ 12–13.  Again, we agree with Petitioner that
Ohsaki's teaching of a convex surface would have motivated a person of
ordinary skill in the art to add such a surface to Aizawa's sensor, to improve
signal strength, as taught by Ohsaki.  Again, nothing in Ohsaki's disclosure
limits such a benefit to the shape of the convex surface.

Accordingly, we do not agree that Ohsaki's disclosed advantages
attach only to a rectangular convex surface, or would have been inapplicable
to the proposed combination of Aizawa and Ohsaki.

We have considered Patent Owner's second argument, that Ohsaki's
benefits are realized only when the sensor and convex surface are placed on
the back of the user's wrist, which is the opposite side of the wrist taught by
Aizawa.  PO Resp. 34–46.  We do not agree.  As an initial matter, Petitioner
does not propose bodily incorporating the references; Petitioner simply
proposes adding a convex cover to Aizawa's sensor, without discussing
where Aizawa's sensor is used.  *See, e.g.*, Pet. 24–25.  In other words,
Petitioner's proposed modification does not dictate any particular placement,
whether on the palm side or back side of the wrist.

To be sure, Ohsaki's Figures 3A–3B compare the performance of
detecting element 2, including its translucent board 8 having a convex
protrusion, and show better performance when the element is attached to the
back side of the wrist versus the front side of the wrist, when the user is in
motion.  *See* Ex. 1014 ¶¶ 23–24, Figs. 3A–3B.  However, we do not agree
that these figures support Dr. Madisetti's conclusion that "Ohsaki indicates a
convex surface only prevents slipping on the back (i.e., watch) side of the
wrist in a specific orientation, but tends to slip when used in different

locations or orientations" such as the palm side of the wrist—particularly in comparison to a flat surface such as Aizawa's. Ex. 2004 ¶¶ 67–81. Instead, Ohsaki acknowledges that, even when the detecting element is located "on the front [palm] side of the user's wrist 4, *the pulse wave can be detected well* if the user is at rest." Ex. 1014 ¶ 23 (emphasis added). Thus, Ohsaki discloses that, in at least some circumstances, a convex surface located on the front of the user's wrist achieves benefits. *Id.* Notably, the claims are not limited to detection during movement or exercise.

We credit, instead, Dr. Kenny's testimony that a person of ordinary skill in the art would have understood from Ohsaki that a convex protrusion will help prevent slippage, even in the context of Aizawa's sensor. *See* Ex. 1060 ¶¶ 10–11, 15–16, 24–30. Dr. Kenny acknowledges that

> certain locations present anatomical features that provide for easy measurement of large reflected light signals and other locations present anatomical features that reduce the amplitude of the reflected light signals. Because of this, a [person of ordinary skill in the art] would be motivated to search for features from other references that can provide improved adhesion, improved light gathering, reduced leakage of light from external sources, and protection of the elements within the system in order to successfully detect a pulse wave signal from many locations.

*Id.* ¶ 16. We credit Dr. Kenny's testimony that, in light of Ohsaki's teaching of a convex protrusion in "intimate contact with the surface of the user's skin," a skilled artisan would have understood that such a surface "would have increased adhesion and reduced slippage of Aizawa's sensor when placed on either side of a user's wrist or forearm, and additionally would have provided associated improvements in signal quality." *Id.* ¶ 29.

Dr. Madisetti testifies that "[b]ased on Aizawa's teaching that a flat acrylic plate improves adhesion on the palm side of the wrist, and Ohsaki's

teaching that a convex surface tends to slip on the palm side of the wrist, a [person of ordinary skill in the art] would have come to the opposite conclusion from Dr. Kenny: that modifying Aizawa's flat adhesive plate 'to include a lens/protrusion . . . similar to Ohsaki's translucent board' would *not* 'improve adhesion.'" Ex. 2004 ¶ 85. We disagree with this reading of Aizawa. It is true that Aizawa's plate 6 is illustrated as having a flat surface (Ex. 1006, Fig. 1(b)), and that Aizawa states the plate "improve[s] adhesion" (*id.* ¶ 13). Aizawa further states: "the above belt 7 is fastened such that the acrylic transparent plate 6 becomes close to the artery 11 of the wrist 10," and "[t]hereby, adhesion between the wrist 10 and the pulse rate detector 1 is improved." *Id.* ¶ 26. These disclosures, however, indicate the improved adhesion is provided by the acrylic material of plate 6, not the shape of the surface of the plate, which is never specifically addressed. *Id.* ¶¶ 30, 34 ("Since the acrylic transparent plate 6 is provided . . . adhesion between the pulse rate detector 1 and the wrist 10 can be improved . . . ."). Aizawa does not associate this benefit of improved adhesion with the surface shape of the plate, but rather, with the existence of an acrylic plate to begin with. Thus, there is no teaching away from using a convex surface to improve the adhesion of Aizawa's detector to the user's wrist.

We have considered Patent Owner's third argument that a convex cover would condense light away from Aizawa's peripheral detectors, which Patent Owner alleges would decrease signal strength. PO Resp. 46–54. We disagree.

There appears to be no dispute that when emitted light passes through user tissue, the light diffuses and scatters as it travels. *See, e.g.*, Pet. Reply 25 ("[R]eflectance-type sensors work by detecting light that has been

IPR2020-01716
Patent 10,702,194 B1

'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector.' A [person of ordinary skill in the art] would have understood that light that backscatters from the measurement site after diffusing through tissue reaches the active detection area from various random directions and angles.") (quoting Ex. 1023, 86); PO Sur-reply 16–17 ("Even Petitioner admits, however, that tissue randomly scatters and absorbs light rays, which would cause forward and reverse light paths to be unpredictable and very likely different.").

The light thus travels at random angles and directions, and no longer travels in a collimated and perpendicular manner. Exhibit 1061,[7] Figure 4.12, illustrates the difference between diffuse and collimated light, and is reproduced below:



This figure provides at left a photograph and an illustration showing incoming collimated light reflecting from a smooth surface, and at right a photograph and an illustration of incoming collimated light reflecting from a

[7] Eugene Hecht, *Optics* (2nd ed. 1990).

rough surface. *See* Ex. 1061, 87–88 (original page numbers). The smooth surface provides specular reflection, in which the reflected light rays are collimated like the incoming light rays. *See id.* The rough surface provides diffuse reflection, in which the reflected light rays travel in random directions. *See id.*; *see also* Ex. 1060 ¶¶ 38–39 (discussing Ex. 1061, Figure 4.12), 46 ("A [person of ordinary skill in the art] would have understood that light that backscatters from the measurement site (after diffusing through tissue) reaches the active detection area from many random directions and angles.").

By contrast Dr. Kenny testifies that Aizawa's sensor "detect[s] light that has been 'partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector.'" Ex. 1060 ¶ 53 (quoting Ex. 1023, 86). Dr. Kenny further opines that a convex cover, when added to Aizawa's sensor with multiple detectors symmetrically arranged about a central light source, "allows light rays that otherwise would have missed the detection area to instead be directed toward that area as they pass through the interface provided by the cover," thus increasing the light-gathering ability of Aizawa's sensor. *Id.* ¶ 49.

By contrast Dr. Madisetti testifies that "a convex 'lens/protrusion' would direct light away from the detectors and thus result in decreased light collection and optical signal strength at the peripheral detectors" because it condenses light towards the center of the sensor and away from the peripheral detectors. Ex. 2004 ¶¶ 86–87, 90. We have considered this testimony, however, Dr. Madisetti's opinions largely are premised upon the behavior of collimated and perpendicular light as depicted in Figure 14B of the challenged patent. *See id.* ¶ 89. Dr. Madisetti does not explain how light

would behave when approaching the sensor from various angles, as it would after being reflected by tissue. *Id.* ¶¶ 87–90; *see also id.* ¶¶ 91–97 (addressing motivation and also failing to discuss diffuse, scattered light). In other words, even if Patent Owner is correct that the '194 patent's Figure 14B depicts light condensing toward the center, this is not dispositive to the proposed modification, because light reflected by a user's tissue is scattered and random, and is not collimated and perpendicular as shown in Figure 14B. Ex. 1001, Fig. 14B.

Patent Owner and Dr. Madisetti argue that "Petitioner and Dr. Kenny both [previously admitted] that a convex cover condenses light towards the center of the sensor and away from the periphery," in a different petition filed against a related patent, i.e., in IPR2020-01520. PO Resp. 47–48; Ex. 2004 ¶ 87. The cited portions of the Petition and Dr. Kenny's declaration from IPR2020-01520 discuss a decrease in the "mean path length" of a ray of light when it travels through a convex lens rather than through a flat surface. *See, e.g.*, Ex. 2020 ¶¶ 118–120. We do not agree that this discussion is inconsistent with Dr. Kenny's testimony here that, where light is reflected to the detectors at various random angles and directions, more light will reach Aizawa's symmetrically disposed detectors when travelling through the convex surface than would be reached without such a surface, because light that might have otherwise missed the detectors now will be captured. *See, e.g.*, Ex. 1060 ¶¶ 31 ("[A] cover featuring a convex protrusion would improve Aizawa's signal-to- noise ratio by causing more light backscattered from tissue to strike Aizawa's photodetectors than would have with a flat cover."), 34 ("improves 'light concentration at pretty much ***all of the locations under the curvature of the lens***"), 46 ("A [person of

ordinary skill in the art] would have understood that light which backscatters from the measurement site after diffusing through tissue reaches the active detection area from various random directions and angles."), 49 ("[L]ight rays that may have otherwise missed the detection area are instead directed toward that area as they pass through the interface provided by the cover."); *see generally id.* ¶¶ 31–59. We do not discern that the convergence of a single ray of light toward the center, as discussed in IPR2020-01520, speaks to the aggregate effect on *all* light that travels through the convex surface.

We additionally do not agree with Patent Owner's argument that Petitioner's Reply presents new theories that should have been first presented in the Petition, to afford Patent Owner an adequate opportunity to respond. The Petition proposed a specific modification of Aizawa to include a convex protrusion in the cover, for the purpose of, *inter alia*, increasing the light gathering ability of Aizawa's device. *See* Pet. 24–25. Patent Owner's Response then challenged that contention, with several arguments that Petitioner's proposed convex protrusion would not operate in the way the Petition alleges it would operate. *See* PO Resp. 46–54. This opened the door for Petitioner to provide, in the Reply, arguments and evidence attempting to rebut the contentions in the Patent Owner Response. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"),[8] 73 ("A party also may submit rebuttal evidence in support of its reply."). This is what Petitioner did here. The Reply does not change Petitioner's theory for obviousness; rather, the Reply presents more argument and evidence in support of the same theory for obviousness presented in the Petition. *Compare* Pet. 22–28, *with* Reply 20–31.

---

[8] Available at https://www.uspto.gov/TrialPracticeGuideConsolidated.

IPR2020-01716
Patent 10,702,194 B1

Rationale 3

Petitioner further contends that a person of ordinary skill in the art would have recognized that a cover with a protruding convex surface, such as that taught by Ohsaki, would "protect the elements within the sensor housing" of Aizawa. Pet. 24–25. We are persuaded that adding a convex cover, such as that taught by Ohsaki, would also protect the sensor's internal components in a manner similar to Aizawa's flat acrylic plate. Ex. 1003 ¶ 105; Ex. 1060 ¶ 60; *see also* Ex. 1008 ¶ 15 (noting that a cover "protect[s] the LED or PD").

We disagree with Patent Owner's fourth argument that a person of ordinary skill in the art would not have modified Aizawa as proposed because a convex cover would be prone to scratches and because other alternatives existed. Patent Owner does not explain how the potential presence of scratches on a convex cover would preclude that cover's ability to, nonetheless, protect the internal sensor components in Aizawa, as Petitioner proposes. That a convex cover may be more prone to scratches than Aizawa's flat cover is one of numerous tradeoffs that a person of ordinary skill in the art would consider in determining whether the benefits of increased adhesion, signal strength, and protection outweigh the potential for a scratched cover. *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006). Moreover, as Petitioner notes, and Patent Owner does not dispute, a scratch resistant material could be employed in fabricating the cover. Pet. Reply 32; PO Sur-reply 23. The record does not support the premise that the possibility of scratches alone would have dissuaded a person of ordinary skill in the art from the proposed modification, to achieve the benefits identified by Petitioner.

IPR2020-01716
Patent 10,702,194 B1

For the foregoing reasons, we are persuaded by Petitioner's contentions.

> ix. *"[m] a handheld computing device in wireless communication with the physiological sensor device, wherein the handheld computing device comprises"*

<u>Petitioner's Contentions</u>

Petitioner contends Aizawa teaches a sensor device that uploads data to an external display, but notes that Aizawa "is silent about how such data transmission would be implemented." Pet. 28 (citing Ex. 1006 ¶¶ 15, 23, 35; Ex. 1003 ¶ 84). Petitioner contends that Mendelson-2006 teaches that a body-worn sensor wirelessly communicates data to a body-worn receiver module, and the receiver module then wirelessly communicates data to a handheld PDA. *Id.* at 14, 28–29, 47.[9] Petitioner additionally contends that a person of ordinary skill in the art would have "found it obvious and straightforward to further modify Aizawa-Mendelson-2003-Ohsaki in view of Mendelson-2006 to yield a pulse detector that can transmit data to an external device—i.e., handheld computing device—for monitoring" and "to enable a convenient and user-friendly interface with Aizawa's detector (which does not include a separate display/interface) and the ability to

---

[9] At pages 47–48, the Petitioner refers to "Mendelson-2003" when discussing the receiver module and PDA. *See, e.g.*, Pet. 47 (contending that the modified system "includes Aizawa's wrist-worn sensor device that is in communication with Mendelson-2003's body-worn receiver module (below left) and PDA (below right)"). The cited disclosures, however, appear in Mendelson-2006, as Petitioner's citations confirm. *Id.* at 47–48 (citing Ex. 1016). Therefore, it appears these references to "Mendelson-2003" are inadvertent typographical errors, and that "Mendelson-2006" was intended. *See also id.* at 28–29 (referring to Mendelson-2006's receiver module and PDA).

IPR2020-01716
Patent 10,702,194 B1

remotely monitor the user's physiological parameters." Pet. 28–29; *see, e.g.*, Ex. 1003 ¶¶ 85–86.

<u>Patent Owner's Arguments</u>

Patent Owner does not dispute Petitioner's contentions regarding the proposed combination with Mendelson-2006 to address this limitation. Patent Owner does argue, however, that "Mendelson 2006 confirms that Petitioner's arguments regarding Mendelson 2003's two-ring detector arrangement are meritless." PO Resp. 67. According to Patent Owner, Mendelson-2006 confirms that a skilled artisan would have used a single annular photodetector to reduce power consumption. *Id.* (citing Ex. 1016, 1, 4, Fig. 2).

<u>Analysis</u>

We are persuaded by Petitioner's undisputed contentions regarding this limitation. We agree that Mendelson-2006 teaches wireless communication between a sensor and a handheld computing device, i.e., a PDA. *See, e.g.*, Ex. 1016, 1–2 (describing system), Fig. 1 (sensor attached to skin), Fig. 3 (PDA). We are persuaded that Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny, who opines that such a modification would enable a convenient and user-friendly interface with Aizawa's sensor. Ex. 1003 ¶ 86; *id.* ¶¶ 84–86, 109–111.

We also have considered Patent Owner's argument as it relates to limitations [c–e] and [g–i], but we do not agree. As noted above, Petitioner provides persuasive evidence demonstrating that the proposed combination would have realized power savings. *See, e.g.*, Ex. 1024, 3019, Table 1.

> x. *"[n] one or more processors configured to wirelessly receive one or more signals from the physiological sensor device, the one or more signals responsive to at least a physiological parameter of the user"*

The cited evidence supports Petitioner's undisputed contention that, in the proposed combination, Mendelson-2006's receiver includes a microcontroller (processor) that wirelessly receives signals from Aizawa's sensor and transmits them to the PDA.  Pet. 50; *see, e.g.*, Ex. 1016, 1, 2 ("The information acquired by the Sensor Module is transmitted wirelessly via an RF link over a short range to a body-worn Receiver Module.  The data processed by the Receiver Module can be transmitted wirelessly to a PDA."), 3 (explaining that the PDA "has sufficient computational resources for the intended application" and "can also serve to temporarily store vital medical information received from the wearable unit"), Fig. 3 (displaying $SpO_2$ and HR data); Ex. 1003 ¶¶ 112–113.

> xi. *"[o] a touch-screen display configured to provide a user interface, wherein: [p] the user interface is configured to display indicia responsive to measurements of the physiological parameter, and [q] an orientation of the user interface is configurable responsive to a user input"*

The cited evidence supports Petitioner's undisputed contention that, in the proposed combination, Mendelson-2006 describes a PDA with a touchscreen display configured to display indicia responsive to measurements of, e.g., $SpO_2$ and HR.  Pet. 51–52; *see, e.g.*, Ex. 1016, 3 ("The use of a PDA . . . also provides a low-cost touch screen interface."), Fig. 3 (displaying $SpO_2$ and HR data).

Petitioner acknowledges that "Mendelson-2006 does not explicitly state that an orientation of the GUI provided by the PDA is configurable responsive to a user input." Pet. 52. However, Petitioner contends that a person of ordinary skill in the art would have understood that the "'LabVIEW program' . . . [and] the 'Windows CE™' operating system" would have "enabled users to dynamically switch the screen orientation between portrait and landscape modes." *Id.* at 53; *see, e.g.*, Ex. 1003 ¶¶ 116–118.

Petitioner further contends that, in light of these teachings, a person of ordinary skill in the art "would have found it obvious to make an orientation of the PDA's user interface configurable responsive to a user input, for the sake of user convenience." Pet. 53; *see, e.g.*, Ex. 1003 ¶ 118. Petitioner's stated reasoning for the proposed modification is sufficiently supported, including by the unrebutted testimony of Dr. Kenny, who testifies as to the convenience of the combination. *See, e.g.*, Ex. 1003 ¶¶ 114–118.

> xii.    *"[r] a storage device configured to at least temporarily store at least the measurements of the physiological parameter."*

The cited evidence supports Petitioner's undisputed contention that, in the proposed combination, Mendelson-2006 teaches that the PDA is configured to store vital medical information received from the wearable pulse oximeter, and that an ordinarily skilled artisan "would have understood that the vital medical information would have included measurements of the physiological parameters obtained by the physiological sensor device (e.g., HR)." Pet. 54; Ex. 1016, 3 ("The PDA can also serve to temporarily store vital medical information received from the wearable unit."); Ex. 1003

¶ 120.  Thus, Petitioner contends that a person of ordinary skill in the art "would have configured a storage device of the PDA to at least temporarily store measurements of physiological parameters (e.g., HR)."  Pet. 53; *see, e.g.*, Ex. 1003 ¶¶ 119–120.

### xiii.    Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claim 1 would have been obvious over the cited combination of references.

## 6.    Dependent Claims 2–18

Petitioner contends that claims 2–18 would have been obvious based on the same combination of prior art addressed above.  These challenged claims all depend directly or indirectly from independent claim 1.

### i.    Dependent Claims 2–12, 14–16, 18

Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art.  Pet. 54–70, 72–75.  Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny.  Ex. 1003 ¶¶ 121–146, 150–152, 154.

Patent Owner does not present any arguments for these claims other than those we have already considered with respect to independent claim 1.  PO Resp. 68 ("[T]he Petition fails to establish that independent claims 1, 20, and 30 are obvious in view of the cited references of Ground 1 and therefore

IPR2020-01716
Patent 10,702,194 B1

fails to establish obviousness of any of the challenged dependent claims.");
*see supra* § II.D.5.

We have considered the evidence and arguments of record and determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2–12, 14–16, 18 would have been obvious over the combined teachings of the cited references and as supported by the testimony of Dr. Kenny.

### ii.    *Dependent Claims 13 and 17*

Dependent claim 13 ultimately depends from independent claim 1 and further recites "the protruding convex surface protrudes a height between 1 millimeter and 3 millimeters." Ex. 1001, 46:49–51.

Dependent claim 17 ultimately depends from independent claim 1 and further recites "the protruding convex surface protrudes a height greater than 2 millimeters and less than 3 millimeters." *Id.* at 47:1–3.

Petitioner contends that the sensor rendered obvious by the combined teachings of Aizawa, Mendelson-2003, Ohsaki, and Mendelson-2006 would have included a cover with a protruding convex surface. *See supra* § II.D.5.viii. With respect to claim 13, Petitioner contends that a person of ordinary skill in the art "would have found it obvious that a device designed to fit on a user's wrist would be on the order of millimeters," consistent with Ohsaki's disclosure that the device is in "intimate contact" with the user's skin. Pet. 70–71 (citing, e.g., Ex. 1003 ¶¶ 148–149). Petitioner also contends that an ordinarily skilled artisan would have taken user comfort into account when establishing the dimensions of the device's convex cover. *Id.* With these considerations in mind, Petitioner contends that, "in order to provide a comfortable cover that prevents slippage, the convex surface

should protrude a height between 1 millimeter and 3 millimeters," because "there would have been a finite range of possible protruding heights, and it would have been obvious to select a protruding height that would have been comfortable to the user." *Id.* (citing, e.g., Ex. 1003 ¶ 149). With respect to claim 17, Petitioner incorporates its contentions regarding claim 13. Pet. 75; Ex. 1003 ¶ 153.

Patent Owner argues that none of the cited references discloses the claimed height range and that Petitioner relies on hindsight reconstruction. PO Resp. 59 (citing, e.g., Ex. 2004 ¶¶ 121–125). Patent Owner also characterizes Dr. Kenny's testimony as conclusory and unsupported. *Id.* at 71–72.

Petitioner is correct that, "[w]hen there are a finite number of identified, predictable solutions, a person of ordinary skill in the art has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product . . . of ordinary skill and common sense." *KSR*, 550 U.S. at 398. Petitioner has shown sufficiently that only a finite number of solutions existed with respect to the height of a convex protrusion on a tissue-facing sensor, which would have met the art-recognized goals of both (1) intimate contact between the sensor's surface and the user and (2) user comfort. *See, e.g.*, Ex. 1014 ¶¶ 6, 25. Bearing in mind these considerations, we credit Dr. Kenny's testimony that it would have been obvious, "in order to provide a comfortable cover featuring a protruding convex surface that prevents slippage, [that] the surface should protrude a height between 1 millimeter and 3 millimeters," as recited in claim 13, and which further includes the claimed range of 2 to 3 millimeters as recited in claim 17. Ex. 1003 ¶ 149. Further, the record does

IPR2020-01716
Patent 10,702,194 B1

not support that any new and unexpected results were achieved at the claimed height greater than 2 millimeters and less than 3 millimeters. *See, e.g.*, Ex. 1001, 23:43–50 ("The height 430 can be from about 0.5 millimeters to about 3 millimeters, e.g., about 2 millimeters. In an embodiment, the dimensions 400, 410, and 430 can be selected such that the measurement site contact area 470 includes an area of about 80 square millimeters, although larger and smaller areas can be used for different sized tissue for an adult, an adolescent, or infant, or for other considerations.").

We have considered Patent Owner's argument, and Dr. Madisetti's cited testimony. However, it is not dispositive that none of the cited references teaches the claimed range. PO Resp. 69; Ex. 2004 ¶ 121. Petitioner relies upon the knowledge, ability, and creativity of a person of ordinary skill in the art, not the teachings of a specific reference. Notably, Dr. Madisetti does not dispute Dr. Kenny's position that there were a finite number of options available for the height of the convex surface. Ex. 2004 ¶¶ 121–125. Therefore, we do not agree that Petitioner's contentions are rooted in impermissible hindsight. *See, e.g.*, *In re McLaughlin*, 443 F.2d 1392, 1395 (CCPA 1971) ("Any judgment on obviousness is in a sense necessarily a reconstruction based upon hindsight reasoning, but so long as it takes into account only knowledge which was within the level of ordinary skill at the time the claimed invention was made and does not include knowledge gleaned only from applicant's disclosure, such a reconstruction is proper.").

Accordingly, for the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that

IPR2020-01716
Patent 10,702,194 B1

claims 13 and 17 would have been obvious over the cited combination of references.

### 7.   *Claims 20 and 22–30*

Independent claim 20 consists of limitations that are substantially similar to elements [a]–[j] and [l]–[m] of claim 1.  *Compare* Ex. 1001, 45:2–49, *with id.* at 47:9–36.  In asserting that claim 20 would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, and Mendelson-2006, Petitioner refers to the contentions made regarding claim 1.  *See* Pet. 75–76; Ex. 1003 ¶¶ 155–161.

Dependent claims 22–29 all depend directly or indirectly from independent claim 20.  Petitioner identifies teachings in the prior art references that teach or suggest the limitations of these claims, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art.  Pet. 76–79.  Petitioner also supports its contentions for these claims with the testimony of Dr. Kenny.  Ex. 1003 ¶¶ 162–181.

Independent claim 30 includes limitations similar to limitations [a]–[r] of claim 1, and also includes additional recitations.  *Id.* at 48:38–50:21 (reciting also a "substrate" and certain "preprocessing electronics").  In asserting that claim 30 would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, and Mendelson-2006, Petitioner refers to the contentions made regarding claim 1, as well as claims depending therefrom.  *See* Pet. 79–82; Ex. 1003 ¶¶ 182–208.

Patent Owner does not present any argument for these claims other than those we have already considered with respect to independent claim 1 and dependent claims 13 and 18.  PO Resp. 12–72.

IPR2020-01716
Patent 10,702,194 B1

For the same reasons discussed above, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 20 and 22–30 would have been obvious over the cited combination of references. *See supra* II.D.5–6; Ex. 1003 ¶¶ 155–208.

### 8. Summary

For the foregoing reasons, we determine that Petitioner has met its burden of demonstrating by a preponderance of the evidence that claims 1–18, 20, and 22–30 would have been obvious over the cited combination of references.

### E. Obviousness over the Combined Teachings of Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, and Beyer

Petitioner contends that claims 19 and 21 of the '194 patent would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, and Beyer.  Pet. 82–85.

### 1. Overview of Beyer (Ex. 1019)

Beyer is a U.S. patent titled "Cellular Phone/PDA Communication System," and discloses a "cellular PDA communication system for allowing a plurality of cellular phone users to monitor each others' location and status[ and] to initiate cellular phone calls."  Ex. 1019, code (57).  Beyer's Figure 1 is reproduced below.

IPR2020-01716
Patent 10,702,194 B1



FIG. 1

Figure 1 depicts a "cellular phone/PDA and display." *Id.* at 7:8–9.

2.  *Analysis*

Claims 19 and 21 depend directly from independent claims 1 and 20, respectively, and recite that "the handheld computing device comprises a mobile phone." Ex. 1001, 47:6–8, 47:37–39.

Petitioner contends that claims 19 and 21 would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, and Beyer. Pet. 82–85. Petitioner identifies teachings in the prior art references that teach or suggest the limitations of this claim, and provides persuasive reasoning as to why the claimed subject matter would have been obvious to one of ordinary skill in the art. Pet. 82–85; Ex. 1019, 1:6–15, Fig. 1. Petitioner also supports its contentions for this claim with the testimony of Dr. Kenny. Ex. 1003 ¶¶ 209–212.

Patent Owner does not present any argument for these claims other than those we have already considered with respect to independent claim 1.

IPR2020-01716
Patent 10,702,194 B1

PO Resp. 72 ("Ground 2 does not fix the deficiencies in Ground 1."); *see supra* § II.D.

We have considered the evidence and arguments of record, including those directed to claim 1 and addressed above, and we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 19 and 21 would have been obvious over the combined teachings of Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, and Beyer for the reasons discussed in the Petition and as supported by the testimony of Dr. Kenny. *See, e.g.*, Pet. 82–85; Ex. 1019, 1:6–15, Fig. 1; Ex. 1003 ¶¶ 209–212.

IPR2020-01716
Patent 10,702,194 B1

## III. CONCLUSION

In summary:[10]

| Claims | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 1–18, 20, 22–30 | 103 | Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006 | 1–18, 20, 22–30 | |
| 19, 21 | 103 | Aizawa, Mendelson-2003, Ohsaki, Mendelson-2006, Beyer | 19, 21 | |
| **Overall Outcome** | | | 1–30 | |

## IV. ORDER

Upon consideration of the record before us, it is:

ORDERED that claims 1–30 of the '194 patent have been shown to be unpatentable; and

---

[10] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

IPR2020-01716
Patent 10,702,194 B1

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01716
Patent 10,702,194 B1

FOR PETITIONER:

W. Karl Renner
Andrew B. Patrick
Hyun Jin In
Dan Smith
FISH & RICHARDSON P.C.
IPR50095-0025IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
patrick@fr.com

FOR PATENT OWNER:

Jarom D. Kesler
Joseph R. Re
Stephen W. Larson
Jacob L. Peterson
Stephen C. Jensen
KNOBBE, MARTENS, OLSON, & BEAR, LLP
AppleIPR2020-1716-194@knobbe.com
2jzk@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jup@knobbe.com
2scj@knobbe.com

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on June 28, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, P.O. Box 1450
Alexandria, Virginia 22313-1450

A copy of this Notice of Appeal is being filed and served on June 28, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTABe2e – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**
W. Karl Renner
Andrew B. Patrick
Hyun Jin In
in@fr.com
Daniel D. Smith
Fish & Richardson P.C.

3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0025IP1@fr.com
PTABInbound@fr.com
Axf-ptab@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


Dated:  June 28, 2022                    /Jarom Kesler/
                                         Jarom D. Kesler (Reg. No. 57,046)

                                         Attorney for Patent Owner
                                         Masimo Corporation

55611722